[Civ. No. 28870. First Dist., Div. Two. Nov. 17, 1970.]

JOHN T. SQUIRE et al., Plaintiffs and Respondents, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Appellants;
MARGUERITE A. WARREN, Intervener and Appellant.

**COUNSEL**

Thomas M. O'Connor, City Attorney, Thomas A. Toomey, Jr., Assistant Chief Deputy Attorney, and Edmund Bacigalupi, Deputy City Attorney, for Defendants and Appellants.

Long & Levit, Victor B. Levit and Allan R. Moltzen for Intervener and Appellant.

Rosenthal & Leff and Irwin Leff for Plaintiffs and Respondents.

**OPINION**

**TAYLOR, J.**—In a declaratory relief and mandamus action brought by the Transport Workers Union, in its representative capacity, against the City and County of San Francisco, its Mayor, board of supervisors, civil service commission and controller, we are called upon to decide whether the trial court properly interpreted a provision in section 151.3.1 of the Charter of the City and County of San Francisco. Section 151.3.1, submitted to the electorate as Proposition G, approved by the voters in the November 7, 1967 election, and effective July 1, 1968, tied wages and conditions and benefits other than wages of the platform employees and coach and bus operators of the Municipal Railway of the City and County of San Francisco to the "average of the two highest wage schedules" in comparable systems in

the nation. The two highest systems prevailing on July 1 of each year were to be determined by a survey conducted by the civil service commission.

On August 4, 1969, pursuant to the provisions of the section, the civil service commission certified to the board of supervisors systems in Washington, D.C. and Boston, Massachusetts, as the systems with the two highest wage schedules. The collective bargaining agreements for the systems in Washington and Boston contained provisions for cost-of-living adjustments based on changes in the consumer price index, and the figures submitted by the civil service commission included the cost-of-living adjustments already determined and being paid on July 1, 1969. For fiscal 1968-1969, transit systems in New York, the New York Transit Authority and the Manhattan and Bronx Surface Transit Operating Authority, whose collective bargaining agreements contained no provisions for cost-of-living adjustments based on a consumer price index, had been certified as the systems with the two highest wage schedules.

Conditions and benefits other than wages were also tied by provisions of the charter section to the two highest wage schedules. Section 151.3.1(f) provided that, when in the two systems used for certification, vacation, retirement and health service benefits were greater than similar benefits provided by the charter, then an amount not to exceed the difference of such benefits "may be converted to dollar values and the amount equivalent to these dollar values shall be paid into a fund," with further provisions for a joint administration of the fund by representatives of the city and the operators. The collective bargaining agreements of the two New York systems, which contained no cost-of-living provisions and upon which wages and conditions and benefits other than wages had been fixed for fiscal 1968-1969, contained provisions for vacation, retirement and health service benefits that were greater than those already being provided under the charter to San Francisco operators, resulting in substantial payments by the city to the fund.

Because the Washington and Boston agreements were not available at the time set for fixing the wage schedule and conditions and benefits other than wages, the civil service commission recommended that the board of supervisors continue in effect conditions and benefits other than wages provided under the collective bargaining agreements of the two New York systems until further information had been obtained[1] and, basing its estimate

---

[1]The result was that the 1969-1970 *wages per hour* were based on the average of the Washington, D.C. and Boston, Massachusetts systems, but that conditions and benefits *other than wages* were fixed by the New York collective bargaining agreements.

on the prior year, estimated the amount to be paid into the fund for fiscal 1969-1970 to be $1,852,393.[2]

The controversy began when an examination of the collective bargaining agreements of the systems in Washington and Boston revealed that the conditions and benefits other than wages (retirement, vacation and health service benefits) provided in these agreements *were lower than those already provided by the charter* for operators in San Francisco.

At that time, the controller, having already made seven payments totaling $1,080,562 into the fund, received an actuarial study showing that if conditions and benefits other than wages were to be tied to the Washington and Boston agreements, no sum was due to the trust fund, and he thereupon stopped making payments into the fund.

The union then brought this action on behalf of the operators, asking the trial court to declare its rights under the charter section and to provide relief by way of mandamus. Appellant Warren, a resident and a taxpayer, attempted to intervene in a representative capacity on behalf of all the taxpayers in the city and county, but was denied leave to intervene by the trial court.

The trial court ruled that "[T]he definition of 'wage schedule' as used in Section 151.3.1 of the Charter includes only the maximum rate of pay provided in each such wage schedule and does not include cost-of-living adjustments which may be added to the rate of pay . . . [pursuant to] other sections of a collective bargaining agreement" and gave plaintiffs relief by way of mandamus. The city and its officers appeal from this judgment and appellant Warren appeals from the order of the court denying her leave to intervene.

We first consider whether the trial court erred in denying the taxpayer leave to intervene. ■ Intervention is governed by statute (Code Civ. Proc., § 387), and is not a matter of absolute right but is discretionary with the court. We have concluded that the trial court did not abuse its dis-

[2]This amount was computed substantially as follows: New York permits its operators to retire at 50 after 20 years of service at half pay; San Francisco requires 30 years' service before retirement, a dollar value difference of $1,394,617; New York grants four weeks' vacation for operators with 5-15 years of service; San Francisco grants three weeks, a dollar value difference of $145,632; New York pays the entire cost of health service, approximately $19.05 per month; San Francisco pays only a portion, a difference of $14.63 per month per operator, a dollar value difference of $312,144. The fund has been used to make the city's retirement and health service benefits non-contributory by the process of reimbursing to each operator (on a quarterly basis) the deductions made from his paycheck for these benefits.

cretion in denying appellant Warren leave to intervene[3] (*People* v. *City of Long Beach* (1960) 183 Cal.App.2d 271, 274 [6 Cal.Rptr. 658]; *Faus* v. *Pacific Elec. Ry. Co.* (1955) 134 Cal.App.2d 352, 355-356 [285 P.2d 1017]; *La Mesa etc. Irr. Dist.* v. *Halley* (1925) 195 Cal. 739, 741 [235 P. 999]). Furthermore, we have granted the taxpayer permission to file an amicus curiae brief in support of the city and to be heard orally in this court, and have given every consideration to the legal arguments advanced by her. Thus, since the question here is purely one of law, the taxpayer has experienced substantially the same advantages of representation that intervention would have afforded.

The major question is whether the trial court properly interpreted the relevant provisions of the charter. ▇ The interpretation of a charter provision is a proper matter for declaratory relief (*Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626, 636-637 [12 Cal.Rptr. 671, 361 P.2d 247]; *Hoyt* v. *Board of Civil Service Commrs.* (1942) 21 Cal.2d 399 [132 P.2d 804]; *San Bernardino Fire & Police Protective League* v. *City of San Bernardino* (1962) 199 Cal.App.2d 401, 417 [18 Cal.Rptr. 757]). Plaintiffs having pleaded a cause of action in declaratory relief, the trial court was authorized under the provisions of Code of Civil Procedure section 1060 to interpret the disputed charter provisions and to adjudicate this controversy.

The pertinent sections are 151.3.1(b), which provides that the board of supervisors shall fix a "*wage schedule . . .* which shall not be in excess of the average of the *two highest wage schedules* so certified by the civil service commission," and 151.3.1(e), which provides that "the terms *wage schedule and wage schedules* wherever used in the section are hereby defined and intended to include *only the maximum rate of pay provided in each such wage schedule.*" (Italics added.)

In examining the collective bargaining agreement of the Massachusetts

---

[3]Intervener's contention that this action is collusive and nonadversary and that intervention is necessary to protect the interests of the taxpayers is based on a letter to the Mayor by the city attorney expressing the city attorney's legal opinion that the union's position was meritorious, a second letter to the Mayor expressing the city attorney's reluctance to undertake the defense of the lawsuit that had then been filed since he would have to take a position directly contrary to the legal opinion he had advanced in his first letter, and the action of the board of supervisors, having knowledge of these matters, in requiring the city attorney to defend the action.

We see nothing improper in the city attorney's action in giving the Mayor his honest advice that the city had "no case," nor was it improper for the city attorney to defend the city once the declaratory relief and mandamus action had been filed, for this is a duty he is required to perform under the charter. Furthermore, the record, even at the time of the attempted intervention, shows that the city attorney had advanced relevant legal defenses and was vigorously defending the lawsuit in an adversary manner.

Bay Transportation Authority entered into January 1, 1966, amended by memorandum agreement executed March 27, 1969, effective January 1, 1969, we find a table setting forth basic rates of pay starting on January 1, 1966, with specified increases at yearly and six-month intervals. Another part of the agreement provides that "the basic rate of wages . . . shall be subject to cost-of-living adjustments" to be determined quarterly in accordance with a formula based on a consumer price index. The terms of the agreement also provide that "the *basic* hourly or weekly wage rates . . . shall not be reduced because of application of the cost-of-living formula." (Italics added.)

A similar table setting forth basic wage rates with increases at stated intervals and a separate provision for cost-of-living adjustments appears in the agreement of the D.C. Transit System, Inc., effective from November 1, 1966, to October 31, 1969. That agreement also provides that "the basic wage rates *as adjusted* shall not be reduced because of the application of the escalator clause as herein provided." (Italics added.)

It appears, therefore, that the collective bargaining agreements in the systems certified by the civil service commission provide (1) tables setting forth a basic hourly wage with increases certain to occur at stated intervals; and (2) provisions for cost-of-living adjustments in amounts not certain until they are determined on a quarterly basis from a formula based on a fluctuating consumer price index.

It is undisputed that if cost-of-living adjustments are added to the highest rates of pay contained in the respective wage schedules, the two highest systems would be Washington and Boston. If cost-of-living adjustments are not added, the two highest systems would be the New York and Manhattan and Bronx systems.

█ Rules of statutory construction are applied to the interpretation of charter provisions, and the language of a charter must be given its plain meaning (*Currieri* v. *City of Roseville* (1970) 4 Cal.App.3d 997, 1001 [84 Cal.Rptr. 615]). The fundamental rules of statutory construction applicable, set forth in *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]), were considered by the court in construing charter provisions in *San Bernardino Fire & Police Protective League* v. *City of San Bernardino, supra,* 199 Cal.App.2d 401, 413-414.

Although section 151.3.1(e) provides that the term "wage schedule," as used in the section, is "defined and intended to include only the maximum rate of pay provided in each such wage schedule," no cases have been called to our attention that expressly define the terms "maximum rate of pay" or "wage schedule." However, if we use Webster's (7th ed.) Dictionary defini-

tion of "schedule" as being a "printed list," we conclude that the term "wage schedule," as used in sections 151.3.1(b) and 151.3.1(e) refers to a printed list containing hourly wages to be paid municipal railway operators. The amounts included in such a list must necessarily be fixed and certain. Such figures would include the "basic wage rate" and fixed increases certain to occur at stated intervals.

A cost-of-living adjustment cannot be included in the "maximum rate of pay provided in each such wage schedule" since the amount of the cost-of-living adjustment is not known until the formula is applied on a quarterly basis to a consumer price index that fluctuates month by month. The city attorney argues that when the formula is applied and the adjustment is completed, the result is the "current" wage scale in effect on July 1, 1969. The judicial function, however, is simply to ascertain and declare what is in terms or in substance contained in a charter, and not to insert what has been omitted or to omit what has been inserted (*McGill* v. *City & County of San Francisco* (1964) 231 Cal.App.2d 35, 38 [41 Cal.Rptr. 568]; Code Civ. Proc., § 1858). The provision of the charter section does not say the "current" rate of pay; it does not say the "prevailing" rate of pay; it does not say the "maximum rate of pay" provided in each such wage schedule as increased to comply with provisions for cost-of-living adjustments; it *does* say the "maximum rate of pay provided in each such wage schedule," and we agree with the trial court that these words constitute a clearly expressed intention of the charter.

Since section 151.3.1 makes no provision for quarterly cost-of-living adjustments based on the movement of a consumer price index, any other construction would discriminate against San Francisco operators and would defeat the purpose of Proposition G, which was to permit the San Francisco operators to catch up with other employees generally in their fringe benefits. Furthermore, precisely because of their indefinite and escalatory nature, it can be argued that such cost-of-living adjustments should be subject to the approval of the electorate and the provision therefore clearly defined within the charter. Certainly, they involve a fundamental inflationary principle which should not be declared within the meaning of section 151.3.1 by any strained or unnatural interpretation of its terms.

It follows that the trial court properly concluded that the "maximum rate of pay provided in each such wage schedule" does not include cost-of-living adjustments based on a formula tied to a fluctuating consumer price index which may be (but are not certain to be) added to the rate of pay in the schedule by virtue of the terms of another section of a collective bargaining agreement.

■ Mandamus is a proper remedy to compel city officials to perform their charter-prescribed duties (*Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626, 639 [12 Cal.Rptr. 671, 361 P.2d 247]; *Leftridge* v. *City of Sacramento* (1943) 59 Cal.App.2d 516, 525 [139 P.2d 112]). Where these duties are continuing ones, the writ may be directed to future action (*McAlpine* v. *Baumgartner* (1937) 10 Cal.2d 409, 413-414 [74 P.2d 753]; *San Bernardino Fire & Police Protective League* v. *City of San Bernardino, supra,* 199 Cal.App.2d 401, 417). ■ It is clear from the court's order supported by its findings and conclusions of law that it was doing no more than exercising its judicial function by interpreting the disputed charter provisions and ordering compliance with the charter as interpreted. In our opinion, the order does not constitute an interference with the administrative discretion of the city officials or agencies (*San Bernardino Fire & Police Protective League* v. *City of San Bernardino, supra,* p. 415).[4]

Plaintiffs are entitled to prejudgment interest from the dates on which sums became due to the fund pursuant to the Salary Standardization Ordinance as interpreted by the trial court (Civ. Code, § 3287, subd. (a); *Mass* v. *Board of Education* (1964) 61 Cal.2d 612, 624-626 [39 Cal.Rptr. 739, 394 P.2d 579]).

The judgment and order appealed from are affirmed.

Shoemaker, P. J., and Agee, J., concurred.

---

[4]The following portions of the court's conclusions and order clearly illustrate that it was merely interpreting the charter provisions and ordering compliance therewith.

"Plaintiffs are not entitled to a Writ of Mandamus directed to defendants and respondents and each of them, ordering them to make changes in the Salary Standardization Ordinance for fiscal 1969-1970 or to make payments under said ordinance as amended, since there is no evidence that respondents and each of them will refuse to act in conformance with this Court's decision."

"That plaintiffs' prayer for a peremptory writ of mandate commanding defendants and respondents and each of them to make changes in the Salary Standardization Ordinance for fiscal 1969-1970 and to make payments pursuant to said ordinance as amended, is denied."

"That a peremptory Writ of Mandate issue commanding defendants and respondents and each of them that for the fiscal year 1970-1971 and for all subsequent years they are to determine the two systems with the highest wage schedules as defined in Section 151.3.1 of the Charter by using a definition of 'wage schedule' consistent with the definition of 'wage schedule' as set forth herein."