[No. A062708. First Dist., Div. One. Feb. 23, 1995.]

UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, LOCAL 38, et al., Plaintiffs and Respondents, v. CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and Appellants.

**COUNSEL**

Louise H. Renne, City Attorney, Burk E. Delventhal, Jonathan V. Holtzman, Thomas J. Owen and Arthur A. Hartinger, Deputy City Attorneys, for Defendants and Appellants.

Leonard, Carder, Nathan, Zuckerman, Ross, Chin & Remar and Matthew D. Ross for Plaintiffs and Respondents.

**OPINION**

**STEIN, J.**—The City and County of San Francisco (hereinafter the City)[1] appeals an order issuing a writ of mandate compelling the City to pay certain of its employees the difference between the salary they received in the fiscal year 1991-1992, and the salary they would have received pursuant to the

---

[1]The named respondents in the petition for a writ of mandate also included Mayor Agnos (hereinafter Mayor), the controller, the San Francisco Board of Supervisors (hereinafter the

1991-1992 salary standardization ordinance, had it not been vetoed by the Mayor. The trial court found that the Board had a mandatory duty to pass the ordinance and override the Mayor's veto.

The City's appeal raises an issue of first impression: does the Board have the discretion to defer revision of existing wage rates by not passing a salary standardization ordinance, despite the fact that the Commission has conducted a survey of prevailing wages and submitted proposed schedules of compensation recommending increases in existing rates?

We shall conclude that the court erred in granting the union's petition for a writ of mandate. The court's construction of the Charter of the City and County of San Francisco (charter) as requiring the Board to pass a salary standardization ordinance and override the Mayor's veto is inconsistent with provisions of the charter giving the Board the discretion to adopt or reject such schedules of compensation submitted to it by the Commission, and leaving to the Board's discretion *when* to adjust basic pay rates by passing a new salary standardization ordinance.

FACTS

A. *The Salary Standardization Process*

The rates of compensation for most city employees are established by an ordinance known as a "salary standardization ordinance." (Charter, former § 8.401.) Under this ordinance, three separate arms of city government are involved in the salary standardization process: The Commission is responsible for conducting surveys of prevailing wages and calculating prevailing rates in accordance with a formula described in the charter. (Charter, former §§ 8.401, 8.407.) The Commission then submits its "proposed schedules of compensation" (charter, former § 8.401) to the Board, which is vested with the power to "approve, amend, or reject" the proposed schedules of compensation. (Charter, § 8.400(a).) The Mayor has the responsibility to approve or disapprove the salary standardization ordinance. (Charter, § 2.302.)

B. *The 1991-1992 Salary Standardization Ordinance*

Until the last five or six years, economic and fiscal conditions have been such that the City customarily has performed annual surveys and adopted annual salary standardization ordinances. Accordingly, in November of

Board) and the Civil Service Commission of the City and County of San Francisco (hereinafter the Commission). We shall refer to the respondents collectively as the City.

1990, the Board, by resolution, authorized the Commission to conduct a wage survey, for the fiscal year 1991-1992. The Commission submitted its survey and recommended schedules of compensation to the Board in March of 1991. The average recommended increase for all classifications was 5.6 percent at a total cost of $72 million.

However, in February of 1991, the Mayor's office, the controller, and the Board's budget analyst had submitted a joint report to the Board predicting a revenue shortfall ranging from $116.9 million to $158.3 million for the fiscal year 1991-1992. This estimated revenue shortfall was subsequently revised to $135 million. In the face of these predictions, the Mayor recognized that the City would either have to cut city services and programs to cover the entire shortfall, or impose a wage freeze and impose lesser cuts in services. (Charter, §§ 6.203; 6.208) Accordingly, the Mayor notified employee organizations that he was considering urging the Board not to pass a new salary standardization ordinance for 1991-1992, or, if it passed, vetoing the ordinance. The City thereupon began intensive negotiations with the affected unions.[2]

While these negotiations were still pending, the Board passed the 1991-1992 salary standardization ordinance. Pursuant to charter section 2.302, the ordinance was forwarded to the Mayor, who exercised his power to veto it. His veto message explained that "with San Francisco facing an estimated budget shortfall of $135.6 million next year, we simply cannot afford to give city workers a pay raise costing $72 million . . . granting city workers a pay raise next year would require a massive reduction in city services . . . which I am unwilling to do."[3] Negotiations with the unions continued until June 3, 1991, the last regular meeting at which the Board had the power to override the Mayor's veto. By this time tentative agreements had been reached with unions representing the majority of employees that they would accept the "wage freeze" in exchange for various concessions, including agreements not to lay off employees in certain bargaining units, and a guarantee that the Board would pass, and the Mayor would approve, a salary standardization

---

[2]The question whether the City has the power under the charter to impose a wage freeze either by not passing, or vetoing, a salary standardization ordinance is a recurring controversy. Frequently the issue is avoided through the collective bargaining process whereby the union employees waive their right to challenge a wage freeze in exchange for other concessions.

[3]The Board had extended the date for adoption of the 1991-1992 salary standardization ordinance to April 29, 1991, as permitted by charter section 3.100-2. Therefore, had the Mayor not vetoed it, the ordinance would have been effective in the 1991-1992 fiscal year.

ordinance for the 1992-1993 fiscal year. The Board therefore tabled the matter, and did not override the Mayor's veto.

## C. *The Petition for a Writ of Mandate*

On September 11, 1991, the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, Local Union No. 38, and two members of Local 38 (hereinafter the Union) filed a petition for a writ of mandate challenging the validity of the wage freeze. In a first amended petition, filed on February 14, 1992, the Union alleged that "the Mayor . . . and the Board of Supervisors, illegally ignored or abandoned their mandatory duties under the Charter to authorize the payment of prevailing wages to city employees when they imposed a 'wage freeze' for city employees covered by Section 8.401. . . . This wage freeze was accomplished when the mayor vetoed a Salary Standardization Ordinance passed by the Board of Supervisors on April 29, 1991, and when the Board failed to . . . override the veto."

Following notice to class members and an opt out period, the court, on March 20, 1992, made an initial ruling in the Union's favor. On March 31, 1992, the City filed a motion for reconsideration. The court granted the motion, but on May 1, 1992, rendered an oral ruling, in which it again concluded that the Union was entitled to relief. The court held that, "the Charter . . . establishes the requirement . . . that once the [Commission] has prepared a survey pursuant to the provisions of 8.401, the Board of Supervisors is obligated to use that survey and to adopt a new Salary Standardization Ordinance incorporating the results of the new survey as long as there is no question about the accuracy of the survey or the manner in which it was conducted, and that once satisfied that the survey is correct, I do not believe that the Board of Supervisors, under the current Charter provisions, has the discretion to decline to enact it into law for budgetary reasons. [¶] And whether one should say that the same obligation has been imposed upon the Mayor, or whether one should say that the Mayor remains free to veto it and the Board of Supervisors is then obligated to override the veto the result is the same."

After the court and the parties resolved the remaining issues concerning, inter alia, whether certain employees were eligible for relief,[4] the court

---

[4]Many employees elected, through the collective bargaining process, not to challenge the wage freeze for the fiscal year 1991-1992 in exchange for other concessions and benefits. Still

entered a final judgment, granting the petition on July 30, 1993. The City filed a timely notice of appeal on August 2, 1993.

ANALYSIS

I.

A. *The Trial Court's Ruling*

In its effort to ascertain whether the Union's petition sought to compel the performance of an act which the law specifically enjoins, the court faced the daunting task of interpreting the arcane provisions of the City charter. The trial court acknowledged that the express language of the charter supported the City's assertion that the Board had no mandatory duty to adjust basic pay rates on an annual basis, and has the discretion to determine when to adjust basic pay rates. The court nonetheless implied a mandatory duty to pass a salary standardization ordinance whenever the Board authorized the Civil Service Commission to conduct a survey of prevailing wages unless the Board found objections to the accuracy of the survey. The court reasoned that this implied duty ensured that the charter provisions requiring the Board to fix compensations "in accord with" (charter, former § 8.401) and "as close as reasonably possible to prevailing rates" (charter, former § 8.407) could not be evaded by indefinitely deferring revision of those rates, resulting in an ever-widening lag between the rates as fixed, and current prevailing rates.

The court further concluded that the same restraints must be implied with respect to the Mayor's veto power. In other words, the Mayor has no power to veto a salary standardization ordinance, except on the very limited ground that he or she questions the validity of the survey that underlies it. The court, however, deemed the question of the scope of the Mayor's veto power to be irrelevant to its disposition, because, in its view, the same mandatory duty it found in the City charter that compelled the board to pass the 1991-1992 salary standardization ordinance, also compelled the Board to override the Mayor's veto.[5]

others opted out of the class definition. These employees were excluded, under the terms of the writ, from benefiting from the mandated salary adjustments.

[5]The Board passed the 1991-1992 salary standardization ordinance and the Mayor vetoed it. Therefore, assuming arguendo the Board had a duty to pass it, that duty was performed. Nevertheless, the court and the Union, reasoned that because the Board has the power to override the Mayor's veto by a two-thirds vote, the same laws imposing a mandatory duty to pass the ordinance similarly required the Board to muster the super majority vote to override

In sum, pursuant to the trial court's construction of the charter, the Board does not retain any legislative discretion with respect to the revision of existing prevailing wage rates, once it authorizes the Commission to conduct a survey of prevailing wages. Unless the Board objects to the accuracy of the survey, the Board must pass a salary standardization ordinance, adopting the schedules of compensation based on the survey, and override a mayoral veto, if necessary, to enact the ordinance.

## B. *Standard of Review*

Code of Civil Procedure, section 1085 provides that a writ of mandate may issue, "to compel the *performance of an act which the law specially enjoins.*" (Italics added.) ▮▮▮▮ When a writ of mandate is sought with respect to a governmental body, it is essential that the court determine whether the act the writ seeks to compel is a legislative act, involving the exercise of discretion, or purely ministerial. "[A] court is without power to interfere with purely legislative action, in the sense that it may not command or prohibit legislative acts[.] . . . *The reason for this is a fundamental one—it would violate the basic constitutional concept of the separation of powers among the three coequal branches of the government.*" (*Monarch Cablevision, Inc.* v. *City Council* (1966) 239 Cal.App.2d 206, 211 [48 Cal.Rptr. 550]; *Sklar* v. *Franchise Tax Board* (1986) 185 Cal.App.3d 616, 624-625 [230 Cal.Rptr. 42].) If the underlying act involves the exercise of discretionary legislative power, the courts will interfere by mandamus only if the action taken "is 'so palpably unreasonable and arbitrary as to indicate an abuse of discretion as a matter of law.' " (*Los Angeles City etc. Employees Union* v. *Los Angeles City Bd. of Education* (1974) 12 Cal.3d 851, 856 [117 Cal.Rptr. 537, 528 P.2d 353].)

Our review of the court's order therefore turns upon its interpretation of the relevant provisions of the City's charter as imposing a mandatory duty to pass a salary standardization ordinance whenever the Board authorizes the Commission to conduct a survey of prevailing wages.[6]

---

the veto. We question the proposition that the decision to override a mayoral veto can be characterized as anything other than the ultimate discretionary legislative act. We nevertheless need not resolve the question, because we find the underlying premise that the charter imposes upon the Board a mandatory duty to pass the 1991-1992 salary standardization ordinance to be erroneous.

[6]Interpretation of a City charter is a question of law, reviewable de novo. (See *Armstrong* v. *County of San Mateo* (1983) 146 Cal.App.3d 597, 608 [194 Cal.Rptr. 294]; *DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 17 [194 Cal.Rptr. 722].)

## II.

*The Board Retains Discretion Not to Pass a Salary Standardization Ordinance After It Authorizes the Commission to Perform a Survey*

1. *The express language of the charter vests the board with the discretion as to when and whether to revise existing schedules.*

 Generally, the same principles of construction applicable to statutes apply to the interpretation of municipal charters. (*DeYoung* v. *City of San Diego, supra,* 147 Cal.App.3d 11, 17; *Squire* v. *City and County of San Francisco* (1970) 12 Cal.App.3d 974, 980-981 [91 Cal.Rptr. 347].) The courts must always look first to the express language of the statute to ascertain its meaning. (*Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672]; *San Francisco Internat. Yachting etc. Group* v. *City and County of San Francisco* (1992) 9 Cal.App.4th 672, 680 [12 Cal.Rptr.2d 25].)

 The charter does not require that the Board revise existing wage schedules by ordinance at specified intervals. Instead, the charter contains express language vesting the Board with discretion as to *when* to pass a salary standardization ordinance: "The board of supervisors shall have the power and it shall be its duty to fix, by ordinance from *time to time* . . ." rates of compensation for City employees. (Charter, § 8.400, italics added.)[7] Nor does the charter require the Commission to conduct annual surveys of prevailing wages. Instead, the charter only requires that surveys be conducted at five-year intervals, "and more often if in the judgment of the civil service commission or the board of supervisors economic conditions have changed to the extent that revision of existing schedules *may be* warranted in order to reflect current prevailing conditions." (Charter, former § 8.401, italics added.)

Despite the absence of any charter provision requiring the Board to pass a salary standardization ordinance in any particular year, the trial court implied a duty to do so whenever the Commission conducts an accurate survey of prevailing wages, and submits a proposed schedule of compensation to the Board. This construction cannot be reconciled with other provisions of

---

[7]In contrast, other provisions of the charter require the Board to re-set wages for some employees annually. Charter section 8.405, for example, requires that police and fire wages must be set effective July 1, of each year. The fact that the charter specifically omits any similar specification of intervals at which salary standardization ordinances should be passed demonstrates that, as stated in charter section 8.400, the timing of such adjustments is left to the Board's discretion.

the charter providing that, even when a survey is conducted, the Commission submits to the Board a proposed schedule of compensation *"for consideration"* (Charter, former § 8.401, italics added), and the Board *"may approve, amend, or reject*, the schedule of compensations proposed by the [Commission]." (*Ibid.*, italics added.) (See, e.g., *Collins* v. *City & Co. of S. F.* (1952) 112 Cal.App.2d 719, 730-731 [247 P.2d 362].)

Another provision of the charter reinforces our conclusion that, even when a survey has been conducted by the Commission of prevailing rates for a particular fiscal year, the Board does not have a mandatory duty to pass a salary standardization ordinance. The charter does not impose upon the Board the duty to pass a salary standardization ordinance by a particular date so that the revision in basic pay rates set forth in the ordinance will be effective for the fiscal year for which a survey was conducted. If the ordinance is adopted after April first of any year, and the time is not extended for 30 days,[8] the ordinance shall not become effective until the next fiscal year. (Charter, former § 8.401.) Therefore, the charter expressly contemplates that even when a survey has been conducted, employees will not necessarily be paid at those rates. The Board may pass a salary standardization ordinance incorporating the proposed revisions, that is not effective until the next fiscal year, resulting in a lag between the rates paid and the current prevailing rates as ascertained in the survey.

Underlying these charter provisions, leaving to the Board the discretion to determine *when* to revise existing schedules of compensation by passing a salary standardization ordinance, is the recognition that the "prevailing wage" is a constantly changing standard, and that its " 'definition is relative to time and place.' " (*Alameda County Employees' Assn.* v. *County of Alameda* (1973) 30 Cal.App.3d 518, 530 [106 Cal.Rptr. 441].) Therefore, unless prevailing wage surveys are perpetually conducted and revisions constantly made to reflect the results of those surveys, some lag between current conditions and the wages set by ordinance will always exist. (See *Los Angeles City etc. Employees Union* v. *Los Angeles City Bd. of Education, supra*, 12 Cal.3d at p. 855.) Some city charters address this problem by specifying the intervals at which surveys must be conducted and salary standardization ordinances must be passed. (*Ibid.*) The San Francisco City Charter, however, leaves to the Board's discretion, the decision as to when existing rates should be adjusted except for the requirement that the Commission conduct a survey at least every five years.

---

[8]Charter section 3.100-2 permits the board to extend by one month, to May 1st, the target date for adoption of a salary standardization ordinance so that it will be effective the next fiscal year.

## 2. *Charter former section 8.407 does not require the Board to pass a salary standardization ordinance.*

Charter section 8.400 and former section 8.401 of the charter vest the Board with discretion as to when to revise existing schedules of compensation, and do not require annual surveys or annual salary standardization ordinances. Nevertheless, the union contends charter former section 8.407 all but eliminated the Board's discretion as set forth in charter former section 8.401 to amend or reject the schedules of compensation proposed by the Commission, and compels the Board to pass a salary standardization ordinance based on the survey, unless it determines that the survey is inaccurate.

The Union relies primarily upon the introductory phrase of charter former section 8.407 which states: "Notwithstanding any provision of Section 8.401 . . . to the contrary, generally prevailing rates of salaries and wages . . . shall be determined by the civil service commission as set forth below. . . ." The Union construes this single introductory phrase as an expression of intent to supersede those provisions of section 8.401 and 8.400 that vest the Board with discretion as to when, and whether to pass a salary standardization ordinance in any particular year. The Union's construction of section 8.407 would eliminate all discretion of the Board in the salary-setting process, except for the initial decision to authorize a prevailing wage survey.

■ We construe charter former section 8.407 more narrowly. The provisions of former section 8.407 are primarily concerned with establishing a precise methodology and formula the Commission must follow when conducting a survey of prevailing wages and preparing a schedule of compensation for submission to the Board. By providing a precise definition of prevailing wages former section 8.407 sharply circumscribes the discretion of the Commission in preparing schedules of compensation for submission to the Board. It further provides that, "*When* fixing rates of compensation the board of supervisors shall fix basic pay rates as close as reasonably possible to prevailing rates, provided, however, that the board of supervisors shall not set the maximum rate of pay for any class in excess of the maximum prevailing rate for that class." (Italics added.) This language surely limits the Board's exercise of discretion as to what constitutes prevailing rates when it decides to enact a salary standardization ordinance. Thus, when the Board fixes rates in a salary standardization ordinance it must fix those rates "as close as reasonably possible" to the prevailing rates ascertained in the survey. (*Union of American Physicians* v. *Civil Service Com.* (1982) 129 Cal.App.3d 392 [181 Cal.Rptr. 93].)

We do not, however, construe the introductory phrase of charter former section 8.407 as an implied repeal of provisions of the charter that vest the

Board with discretion as to when to revise existing schedules of compensation by passing a salary standardization ordinance. The introductory phrase of former section 8.407 states only that provisions of the charter that conflict with the provision of former section 8.407 are superseded. We perceive no conflict between the power of the Board pursuant to charter section 8.400 and former section 8.401 to exercise its discretion as to when it is appropriate to revise existing rates by passing a salary standardization ordinance, and the requirement of former section 8.407 that *when* the Board exercises its discretion to pass a salary standardization ordinance it must fix wages, "as close as reasonably possible" to the prevailing rates ascertained by the Commission. We therefore find no basis for construing former section 8.407 as impliedly eliminating the discretion of the Board not to pass a salary standardization ordinance. Section 8.400 still provides that the Board shall fix wages "from time to time." Former section 8.401 still provides that the civil service commission need not conduct surveys more frequently than at five-year intervals, and that even when a survey has been conducted, the Board may reject the schedule of compensations, and inferentially not pass a salary standardization ordinance at all. That same section also recognizes that even if the Board adopts a salary standardization ordinance it need not become effective in the fiscal year for which a survey is conducted.

The Union cites several city attorney opinions that state that charter former section 8.407 precludes the Board both from establishing "alternative salary range schedules," and from rejecting a schedule of compensation. These opinions do not address the question whether the Board can decline to pass a salary standardization ordinance at all. Instead, they assume an ordinance will be passed and advise, in that context, that when an ordinance is passed the board must fix wages in accordance with former section 8.407.

We conclude that charter former section 8.407 requires only that *when* the Board fixes rates they shall "be in accordance with" prevailing rates or as close as reasonably possible. It does not specify when the Commission shall conduct surveys. Nor does it provide expressly or impliedly that once a survey has been conducted the Board is without discretion to "reject" the proposed schedule of compensation prepared by the Commission by not passing a salary standardization ordinance.[9]

---

[9]The unions also argue that the voters must have intended charter former section 8.407 to guarantee revisions to existing rates by ordinance whenever a survey was conducted so that wages would be set "as close as reasonably possible" to prevailing wages. The City, on the other hand, cites ballot arguments in support of proposition D which amended former section 8.407 that they contend demonstrate that the purpose of the amendment was to *reduce* salaries, not guarantee constant increases. We find it unnecessary to resort to the always

*3. The Sanders decision is distinguishable because it was based on charter provisions requiring annual salary standardization ordinances.*

The Union argues that the decision in *Sanders* v. *City of Los Angeles* (1970) 3 Cal.3d 252 [90 Cal.Rptr. 169, 475 P.2d 201] is dispositive on the issue of charter construction presented in this appeal. Although the facts in *Sanders* are similar to the facts in this case, the relevant charter provisions are fundamentally different. *Sanders*, therefore, is neither dispositive nor persuasive authority with respect to our construction of the City charter. (See, e.g., *City of Oakland* v. *Workmen's Comp. App. Bd.* (1968) 259 Cal.App.2d 163, 168-170 [66 Cal.Rptr. 283].)

In *Sanders*, the Los Angeles Chief Administrative Officer had performed a survey of prevailing wages and submitted it to the city council. "The council approved [the recommendations for salary increases based on the survey] and it requested the city attorney to prepare [a city] ordinance to this effect. This ordinance was adopted July 16, 1962, but was vetoed by the mayor for budgetary reasons. The council failed to override his veto. . . ." (3 Cal.3d at p. 257.)[10] Thereafter, the council readopted the same ordinance but made its effective date approximately six months later. The city employees sought a writ compelling the council to ascertain prevailing wages as of July 1, 1962, and to pay the wages ascertained, and the trial court issued the writ. In a prior decision issuing the writ, the court had found that under the Los Angeles City Charter the council had a mandatory duty to fix wages annually in an amount " 'at least equal to the prevailing [wages].' " (*Id.* at p. 256.) This charter section was implemented by an ordinance that directed the chief administrative officer to conduct a survey and "require[d] the council" to fix salaries in accordance with the chief administrative officer's recommendations "effective as of July 1 of each year." (*Id.* at p. 257.) Consequently, the *Sanders* court held that once the chief administrator had ascertained the prevailing wage rates for a particular fiscal year, the council had no discretion to defer payment by adopting an ordinance that was not effective until six months after the July 1 date mandated by the charter.

Critical to the court's determination that the council had a mandatory duty to pay, effective July 1, the rates ascertained in the survey, was the fact that the Los Angeles City Charter, and the implementing ordinance, expressly required that the survey be conducted annually and that the council must

---

elusive task of ascertaining the voters' intent based on ballot arguments, because we have derived the meaning of charter, former section 8.407 based on its plain language.

[10]The *Sanders* decision was actually a review of the city's return to the writ, and therefore the issues concerning the interpretation of the charter and the validity of the mayor's veto had already been decided.

"make the salaries so fixed effective as of July 1 of each year." (3 Cal.3d at pp. 256-257.)[11]

In *Los Angeles City etc. Employees Union* v. *Los Angeles City Bd. of Education, supra,* 12 Cal.3d 851, the court explained that its decisions in *Sanders* and *Walker* were premised upon the specific charter provisions mandating annual adjustments in wages and that a different result would follow where the claimed adjustment was not mandated by the charter.

The Los Angeles Board of Education had customarily approved midyear salary increases, based on recommendations by the personnel commission. These midyear adjustments were in addition to annual adjustments mandated under the Los Angeles charter and other applicable statutes. (12 Cal.3d at pp. 853, 854-855.) In 1972, in accordance with this practice, the personnel commission recommended to the board certain midyear increases. The board declined to implement the recommended increases, citing the "fiscal problems of the school district and Phase II of the President's wage-price 'freeze.'" (*Id.* at p. 853.) The petitioners sought an order compelling the board to adopt the midyear increases effective January 16. They, like the Union in the case before us, contended that, "once the personnel commission found that prevailing wage increases were due, and so advised the board, the latter had no discretion to disapprove, or delay payment of, those increases." (*Id.* at p. 855.) The petitioners relied upon cases such as *Sanders* v. *City of Los Angeles, supra,* 3 Cal.3d 252, and *Walker* v. *County of Los Angeles, supra,* 55 Cal.2d 626, in support of their theory that once an accurate factual determination regarding prevailing wage levels has been made, the governing board has a mandatory duty to approve corresponding increases.

The court explained that, "[t]he *Sanders* and *Walker* cases, however, are not controlling. Both cases involved the [Board's] obligation to approve the *annual* prevailing wage increase contemplated by the Charters of the City and County . . . of Los Angeles. Both cases agree that the governing board has a mandatory duty to undertake a review of prevailing wages and, having determined those wages, has the further mandatory duty to pay corresponding wage increases. Neither case suggests, however, that the board is without discretion to deny (or delay) a *midyear* increase despite its knowledge of

---

[11]A similar conclusion was reached by the court in another earlier decision, *Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626 [12 Cal.Rptr. 671, 361 P.2d 247]. In that case, the county's board of supervisors failed to pass a salary standardization ordinance because they questioned the accuracy of a survey of prevailing wages. As in *Sanders,* under the relevant charter provision, a survey had to be performed on an annual basis and the board was *required to pass an annual salary standardization ordinance.* Consequently, a writ issued requiring that a survey be conducted and an ordinance passed for the fiscal year in question.

facts indicating that such an increase might be appropriate." (12 Cal.3d at p. 856, italics in original.) The court concluded that the decision to adjust salaries at midyear was discretionary, and the fact that the personnel commission suggested midyear increases did not deprive the board of its discretion to delay or deny the recommended increases. (*Id.* at pp. 856-857.) The court further observed that to deprive the board of its discretion to delay or deny a discretionary adjustment in wages simply because the commission conducted a survey recommending increases, would do violence to the respective roles of the board and the personnel commission established under the relevant sections of the Education Code: "It should be kept in mind that it is the function of the board, not the commission, to fix and pay wages and salaries. (Ed. Code, §§ 13601-13602.) The commission's function is to 'recommend to the governing board salary schedules for the classified service. The governing board may approve, amend, or reject these recommendations.' " (*Ibid.*)

The decision in *Los Angeles City etc. Employees Union* illustrates that the duty of the council, in *Sanders*, to fix salaries at the rates established in the survey, was premised on the fact that the charter left no discretion to the council with respect to the timing of adjustments to wages and salaries. Therefore, once the annual survey was conducted, the council had no discretion to defer the adjustment in wages for six months, because the Los Angeles Charter required that it adjust salaries effective July 1 of the relevant fiscal year.

■ This distinguishment of *Sanders* and *Walker* as premised upon specific charter provisions requiring annual adjustments of salaries to be effective upon a specified date is critical because the San Francisco City Charter *does not* require either annual surveys or the adoption of annual salary standardization ordinances. Instead, as in *Los Angeles City etc. Employees Union* v. *Los Angeles City Bd. of Education, supra,* 12 Cal.3d 851, the adjustment in existing wage rates that the union seeks to compel by writ is discretionary, and the timing of such adjustment is not specified in any provision of the City's charter. The charter does not purport to specify *when* the Board should fix salaries by ordinance other than "from time to time," although it does require that the Commission perform a survey at least every five years. Even when the Board decides to revise existing schedules by passing a salary standardization ordinance, its effective date may be deferred until the next succeeding fiscal year. (Charter, former § 8.401.)

The Union concedes that the charter does not impose any annual obligation to conduct surveys and pass salary standardization ordinances. The

Union nevertheless argues that, pursuant to charter section 8.401, once the Board authorizes the civil service commission to conduct a survey it has necessarily determined that a revision of existing schedules is warranted and thereafter has a mandatory duty to pass a salary standardization ordinance. The Union asserts, therefore, that this case is more like *Sanders, supra,* than *Los Angeles City etc. Employees Union, supra,*

Charter section 8.401 states only that a survey shall be conducted more often than the five-year interval specified, "if in the judgment of the civil service commission or the board of supervisors economic conditions have changed to the extent that revision of existing schedules *may be* warranted in order to reflect current prevailing conditions." (Italics added.) The survey is conducted *as an aid* to the Board in making the ultimate decision whether economic conditions have changed sufficiently to warrant a revision in existing schedules by passing a salary standardization ordinance, and to provide the Board with a proposed schedule of compensations in the event that it does decide to pass an ordinance. To eliminate essentially all of the Board's discretion simply because a survey has been conducted by the Commission would disregard the fact that the Commission acts in an advisory capacity to the Board in its exercise of legislative discretion. (See *Los Angeles City etc. Employees Union* v. *Los Angeles City Bd. of Education, supra,* 12 Cal.3d 851, 855-857.) It would also mean that the Board is committed to pass a salary standardization ordinance *before* it receives the results of a survey designed to ascertain to what extent prevailing rates have changed. Such a result would be absurd.

*4. There is no conflict between the Board's duty to fix rates "in accordance with prevailing rates" and its discretion whether to adopt a salary standardization ordinance.*

As the trial court acknowledged, the express provisions of the charter support the City's contention that the decision as to when existing schedules of compensation should be revised to reflect current prevailing conditions is left to the Board's discretion. Yet, the court found that if these provisions were given their literal meaning the Board could indefinitely defer revision of existing schedules resulting in an ever-widening gap between the established schedules and current prevailing conditions. The court reasoned that this construction would be contrary to the "overall intention of these provisions, plainly contrary to the strong public policy in favor of paying

prevailing wages."[12] The court concluded that, to avoid this scenario, it was necessary to imply some limitation on the Board's power to decide when a salary standardization ordinance should be passed. The court, therefore, construed the charter as eliminating the discretion of the Board not to pass a salary standardization ordinance whenever the civil service commission conducts an accurate survey of prevailing wages.

■ "The judicial function, however, is simply to ascertain and declare what is in terms or in substance contained in a charter, and not to insert what has been omitted or to omit what has been inserted." (*Squire* v. *City and County of San Francisco, supra,* 12 Cal.App.3d 974, 981.) It is unnecessary to resort to a construction of the charter that effectively nullifies express provisions vesting the Board with discretion as to when to pass a salary standardization ordinance to avoid the potential abuse of discretion that would occur if the Board indefinitely deferred revisions in existing schedules of compensation. ■ The court's have always recognized that, even with respect to the exercise of discretion, mandamus will lie if the action, "is fraudulent or so palpably unreasonable and arbitrary as to indicate an abuse of discretion as a matter of law." (*City and County of S. F.* v. *Boyd* (1943) 22 Cal.2d 685, 690 [140 P.2d 666]; see also *Los Angeles City etc. Employees Union* v. *Los Angeles Bd. of Education, supra,* 12 Cal.3d at p. 856.) This standard is, of course, highly deferential, as it should be when the court is asked to intervene with respect to the exercise of legislative discretion by an elected governmental body.

■ This case bears no resemblance to the hypothetical scenario in which the Board exercises its discretion not to revise existing schedules year after year, leaving the rates fixed by ordinance bearing no reasonable relationship to currently prevailing rates. Instead, the Board, by failing to override the Mayor's veto, merely deferred the decision to revise existing schedules for a period of one year. A similar result could also have been accomplished in accordance with the express terms of the charter, simply by refusing to extend the April 1, deadline for passing the ordinance so that it would not have been effective until the 1992-1993 fiscal year. The charter specifically contemplates that lags will exist between the wage rates established by ordinance and current conditions, and guarantees only that when rates are reset, by passage of a new salary standardization ordinance, they will "catch-up." We cannot say on this record that the Board's action is so

---

[12]Ultimately, these arcane and unwieldy charter provisions are the product of delicate political compromise, and it is doubtful that a single underlying intent or purpose exists. It is for this reason that the court should, whenever possible, first give effect to the charter's express terms.

arbitrary, or palpably unreasonable that it constitutes an abuse of discretion as a matter of law. (See *Los Angeles City etc. Employees Union* v. *Los Angeles City Bd. of Education, supra*, 12 Cal.3d 851, 856.)

## CONCLUSION

The judgment is reversed. Costs to appellant.

Strankman, P. J., and Newsom, J., concurred.