[Civ. No. 933. Fourth Appellate District.—May 31, 1932.]

L. T. OLMSTEAD, Respondent, v. CITY OF SAN DIEGO (a Municipal Corporation) et al., Appellants.

M. W. Conkling, City Attorney, and C. L. Byers, Assistant City Attorney, for Appellants.

Harrison G. Sloane, Wright & McKee and C. M. Monroe, for Respondent.

SCOVEL, J., *pro tem.*—This is an action to enjoin the city council of the City of San Diego from constructing a road through Torrey Pines Park. At the time the action was filed the main highway between Los Angeles and San Diego ran through a portion of the park. The highway

contained many curves and, becoming inadequate for the traffic thereover, the city council were preparing to construct a new highway through the park area involved in this action.

The first question involved in the appeal is whether Torrey Pines Park is in fact a park. A consideration of this problem necessitates a brief sketch of the history of the lands involved.

The City of San Diego was originally a Spanish, and then a Mexican pueblo. The lands in question were a portion of the "Pueblo Lands" of the original town. Under the Spanish and Mexican law these "Pueblo Lands" were held in trust by the pueblo for the benefit of the community and could only be used and disposed of in accordance with the order and direction of the king or sovereign power. (*United States* v. *Santa Fe,* 165. U. S. 675 [41 L. Ed. 874, 17 Sup. Ct. Rep. 472] ; *Ames* v. *City of San Diego,* 101 Cal. 390 [35 Pac. 1005] ; *Richert* v. *City of San Diego,* 109 Cal. App. 548 [293 Pac. 673].) The pueblo of San Diego was incorporated as the City of San Diego in 1850, the pueblo lands here involved being recognized as owned by the city, but not located within its corporate limits. Thereafter they were held by the city under the trusts attaching to them as pueblo lands, their use and disposition being subject to the control of the legislature as successor to the sovereign power of the king (*Thompson* v. *Thompson,* 2 Cal. Unrep. 32; *Thompson* v. *Thompson,* 52 Cal. 154, 157; *Hart* v. *Burnett,* 15 Cal. 530, 580; *Ames* v. *City of San Diego, supra*), except the power of "rent, sale or lease", which was expressly given to the city. In 1872 the legislature passed an act whereby the boundaries of the city were extended to include these pueblo lands, and authorizing the city to "provide for the use, care, custody and regulation of all the commons, parks, cemeteries and property, both real and personal, belonging to the city", restricting its power only as to the manner of sale and disposition. (Stats. 1871–72, p. 285.)

It will thus be seen that as early as 1872 the legislature had delegated to the city the unrestricted power of determining how its real property should be used.

In 1889 a freeholders' charter was ratified by the legislature whereby the former City of San Diego was continued as a municipal corporation under the same name, with the same boundaries and "vested with all the property rights

. . . now belonging to the City of San Diego", and was empowered to "hold and enjoy real and personal property . . . and sell, convey and dispose of the same for the common benefit". It further provided, however, that the sale, conveyance or lease of any lands should be made only at public auction after publication of notice of sale. The charter of 1889 also vested the city with "all the property rights" belonging to the city under the act of 1872. This would seem to be sufficient to include by reference the power to "provide for the use" of city property as granted in the act of 1872. A determination of this question is not necessary, inasmuch as the charter of 1889 gave to the city, as above set forth, the right to hold real property and "sell, convey and dispose of the same for the common benefit". That a distinction was recognized between the power to "sell" or "convey" and the power to "dispose" is apparent from the further provision in the charter that the lands could only be "sold" or "conveyed" at public auction after published notice of sale, no restriction being made as to the method of "disposing" of such lands. It is thus quite apparent that the words "sell" and "convey" were used in the usual accepted meaning, implying an alienation or transfer, the interest of the public therein being protected by restrictions providing for publicity and competitive bidding in order to insure a fair price. If the lands were merely "disposed of" by the city in the sense of classifying the same or setting them aside for a specified or particular use, no such necessity for public protection would arise, the public's beneficial interest in the lands not being thereby affected. "To dispose of" is defined in Webster's New International Dictionary, 1929 edition, as meaning "to direct or assign for a use". We therefore conclude that the charter of 1889 granted to the City of San Diego the power to determine and specify what use should be made of these pueblo lands for the common benefit.

The charter of 1889 then conferred upon the common council power "to provide for the execution of all trusts confided to said city", together with the right "to make all rules and regulations necessary to carry into execution all powers vested by this Charter or by law in said city or in any department or office thereof". Pursuant thereto, the city council in 1889 adopted ordinance No. 648, wherein a

portion of the lands now known as Torrey Pines Park were "set aside . . . and dedicated for the use of the citizens of the said City of San Diego now and forever as a public park, and that the same shall be hereafter used for no other purpose". In 1924 a similar ordinance was enacted covering the remaining portions of these lands.

Appellant concedes that the city's "pueblo lands" may be set aside as a park for the benefit of the community, providing it be done by the proper authority. We are of the opinion that by the charter of 1889 the legislature vested this power in the City of San Diego as above set forth and that the ordinance of the city council above effectually set apart and dedicated these lands as a park.

Appellant asserts, however, that an act of the legislature (Stats. 1869, p. 49) indicates that the legislature did not intend to vest such power in the city. This was a statute confirming an ordinance of the City of San Diego setting apart a portion of its pueblo lands as a park to be known as Balboa Park. The statute provided that such lands "and none others," are so dedicated. Appellant argues that this language shows a legislative intent to deny any authority in the city to so dedicate any other land. Conceding such effect at the date of the statute, it could not in any way limit the authority given to the city by a later act of the legislature, and any such attempted limitation implied from the statute of 1869 was annulled by the charter of 1889. (*Harter* v. *San Jose*, 141 Cal. 659 [75 Pac. 344, 346].)

Appellant further contends that even though the park had been properly dedicated, the city might change the use thereof where private property rights are not invaded, citing *Mulvey* v. *Wangenheim*, 23 Cal. App. 268 [137 Pac. 1106]; *Spires* v. *City of Los Angeles*, 150 Cal. 64 [11 Ann. Cas. 465, 87 Pac. 1026]; *Slavich* v. *Hamilton*, 201 Cal. 299 [257 Pac. 60].

In *Mulvey* v. *Wangenheim, supra,* the City of San Diego attempted to construct a road along the west side of Balboa Park, a portion of the land included in the road being pueblo lands theretofore dedicated as a part of the park. The opinion states at page 271:

"Upon the facts herein stated we are of the opinion that the acts complained of constitute a diversion of a portion of the park property from the uses to which it has been dedi-

cated, and will be in violation of the trusts upon which said property is held by the city. It is well established that where a grant is made for a specified, limited, and definite purpose, the subject of the grant cannot be used for another and different purpose.'' (Citing cases.)

In *Spires* v. *City of Los Angeles, supra,* our Supreme Court permitted the erection of a library upon pueblo lands dedicated by the city of Los Angeles as a park, basing its decision on the ground that the establishment of a library is consistent with the use of the property as a park, and tends to enlarge the public enjoyment thereof, pointing out particularly, however, that the lands so dedicated could not be used for a purpose inconsistent with its use as a park.

In *Slavich* v. *Hamilton, supra,* the Supreme Court had before it the question as to whether a veterans' memorial hall could be erected on property dedicated as a park. The defendant relied upon what the court refers to as a ''well settled principle of law'', that land dedicated as a public park must be used in accordance with such dedication and that municipal authorities cannot divert the land from such use. On page 303 the following language is used:

''There can be no dispute as to the general rule relied upon by the respondent but the real question seems to be whether the use in the particular case and for a designated purpose is consistent or inconsistent with park purposes.''

In our case the court found upon sufficient evidence that the proposed road would ''result in material defacement of the natural terrain and in the destruction of at least 14 of the indigenous pines known as Pinus Torreyana''.

Torrey Pines Park consists entirely of uncultivated and unimproved land bordering on broad reaches of the Pacific Ocean, covered with trees, shrubs and indigenous flora in its wild and natural state. Its use by the public for recreation, picnicking and bathing is enhanced by the natural and undisturbed condition of the environment. Its chief charm lies in the silence and lure of its natural surroundings, unmarred by changes of man, and the park board undoubtedly had this in mind when, as hereinafter noted, it refused consent to the construction of the road, perhaps visioning the accompanying rumble and noise of commercial vehicles and the seemingly necessary intrusion of adjoining roadside refreshment establishments. We are of the opinion that the

evidence supports a conclusion that the proposed road would seriously interfere with the use of these lands as a park under the particular conditions involved.

■ Appellant insists, however, that the city charter and the Improvement Act of 1911, incorporated in the city charter by reference, gives to the city council exclusive power to construct roads and claims the right thereby to construct the proposed road through Torrey Pines Park. The sections of the charter relied upon are contained in article II, chapter 1, sections 1, 2d and 2e, and article II, chapter 2, section 1, subsection 44, which vest in the common council all executive and administrative powers relating to public streets, giving the council power to open and lay out any new street or highway on public or private property, and incorporating the general law of the state of California as to the mode and manner of making such improvements where an assessment is levied to pay therefor. That portion of the Improvement Act of 1911 relied upon is section 1, wherein the legislative body of each municipality is empowered to order any of the work to be done mentioned in the act, including the construction of roads and highways.

The charter, however, also provides for a board of park commissioners, vesting in them the exclusive control and management of all parks then or thereafter dedicated with power to lay out, regulate and improve the same. The legislature, by the city charter, thereby delegated its power over pueblo lands in a twofold manner: To the city council was given the authority to "dispose" of them as hereinbefore set forth, and thereafter should the council in its wisdom see fit to set aside a portion thereof as a park, the exclusive right to control and manage the same was given to a board of park commissioners. Appellant concedes that the park board may lay out roads within the park area for ingress thereto and egress therefrom and for the convenient use of the park. If the Improvement Act of 1911 also gives the council the right to construct main highways through the park a conflict of authority within two departments of the city is the inevitable result and there would ensue the amazing spectacle of each body tearing up roads laid by the other, whenever necessary in the furtherance of their own plans, each acting under lawful authority flowing from the same source. It may be noted that the Improvement Act

of 1911 also gives the council power to lay out and construct sewer lines for sanitary purposes with the necessary outlets, catch-basins, cesspools, septic tanks, etc. If under the act the city council has paramount authority, it could thus convert a public park, dedicated for pleasure and recreation purposes, into a sewer farm. Appellant answers that the statute only gives such supreme authority to the council when the contemplated act does not conflict with the purpose for which the property involved was dedicated. To whom, then, is given the power of determining the question as to this conflict? If it is vested in the council then the council may not only act, but may also determine the propriety of its action, and the same result is accomplished as though no restraint were placed upon it.

As above set forth the charter gives to the park board the power to "control and manage" the property. In *Harter* v. *San Jose, supra,* the Supreme Court intimates that "power to control and manage a park" includes the authority to lease a portion thereof for a hotel, if the same adds to the comfortable enjoyment of the park. We are of the opinion that when the power to "control and manage" was given exclusively to the park board by the charter, the board was thereby vested with the duty of determining whether any act contemplated by the council would or would not be consistent with the use of the property dedicated as a park.

The well-settled rule as to statutory construction is set forth in 23 California Jurisprudence, at page 762, as follows:

"It is a settled rule of statutory construction that a general provision is controlled by one that is special, the latter being treated as an exception to the former. A specific provision relating to a particular subject will govern in respect to that subject as against the general provision, although the latter standing alone would be broad enough to include the subject to which the more particular provisions relate. Moreover a provision, although expressed in general and comprehensive language, is construed with reference to the general intent of the act."

It may be conceded that the charter provisions and the Improvement Act of 1911 incorporated therein give to the city council general jurisdiction over the laying out and constructing of roads and highways within the city. Applying

the foregoing rule of statutory construction, however, such general authority is limited by the specific provisions relating to public parks set forth in article V, chapter VII, of the city charter providing for the organization of the park board and vesting in them the exclusive control and management of all parks.

In our case the board refused its consent to the constructing of the road on two main grounds: First, because the proposed road would injure the park; and second, because another route for the highway would solve the traffic problem and not injure the park. These objections to the road were based upon reports of the board's advisory landscape architect, supported by advisory opinions of the consulting park architect of the California state parks commission, the director of the Sequoia National Park and the Torrey Pines Park superintendent. The action of the board is thus amply supported and we are unwilling to question its wisdom.

Appellant cites several cases where a city council was permitted to use portions of parks for purposes such as roads, etc. The cases cited, however, were either where the park board had given its consent to the work, as in *Harter* v. *San Jose* and *Spires* v. *Los Angeles, supra,* or where no objection to the work was made by the board, as in *Humphreys* v. *San Francisco,* 92 Cal. App. 69 [268 Pac. 388], or where it did not appear that any authority was vested in a park board, as in *Pettitt* v. *Mayor and Council of Macon,* 95 Ga. 645 [23 S. E. 198]. In all of the cases so cited it also appeared that the contemplated use was not inconsistent with the use of the property as a park. The decisions are obviously not controlling here.

The judgment is affirmed.

Barnard, P. J., and Marks, J., concurred.