[No. A129173. First Dist., Div. Two. Aug. 24, 2010.]

JOHN ARNTZ, as Director, etc., et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN
FRANCISCO, Respondent;
MICHELA ALIOTO-PIER, Real Party in Interest.

## COUNSEL

Dennis J. Herrera, City Attorney, Jonathan Givner, Andrew Shen and Mollie Lee, Deputy City Attorneys, for Petitioners.

No appearance for Respondent.

The Sutton Law Firm, James Ross Sutton, Kevin R. Heneghan, William B. Tunick; The Alioto Law Firm, Joseph M. Alioto and Thomas Paul Pier for Real Party in Interest.

## OPINION

**RICHMAN, J.**—The voters of the City and County of San Francisco imposed term limits on their board of supervisors in 1990 by putting this language into the city charter: "No person elected or appointed as a Supervisor may serve as such for more than two successive four-year terms. Any person appointed to the office of Supervisor to complete in excess of two years of a four-year term shall be deemed, for the purpose of this section, to have served one full term." (S.F. Charter,[1] § 2.101 (section 2.101).) The practice of counting service of less than four years as a full term is known as "rounding up," and it is central to this dispute.

■ There have been four elections since 1990 where the voters of San Francisco considered Charter initiatives affecting the composition and election of the board of supervisors, and in none of them was there any hint that term limits would be relaxed. Nevertheless, the San Francisco Superior Court concluded that when an appointed supervisor has served three years of a predecessor's four-year term—two of them after having stood at the polls and been elected in his or her own right—that period of service is not rounded up and does not count as one of the two terms—a conclusion that would allow an appointed supervisor to serve more than the voter-mandated maximum of 10 consecutive years. This conclusion was erroneous because it would eviscerate section 2.101. We hold that when an appointed supervisor has served three years of one term, and then been elected and served four years of another term, the rounding up language of section 2.101 is operative, and prohibits the supervisor being a candidate for another four-year term. Because respondent court ruled that the supervisor could run again, we order issuance of a peremptory writ of mandate upholding the decision of election officials refusing to put the supervisor's name on the ballot.

### BACKGROUND

In June 1990, five months before term limits were adopted for state officers (see *Legislature v. Eu* (1991) 54 Cal.3d 492 [286 Cal.Rptr. 283, 816 P.2d 1309], addressing Cal. Const., art. IV, § 1.5, added by Prop. 140, adopted at the Nov. 1990 general election), the voters of San Francisco adopted what is now section 2.101. Originally designated section 9.100, it provided in pertinent part: "Notwithstanding any provisions of this section or any other section of the charter to the contrary, from and after the effective date of this section as amended, no person elected or appointed as a supervisor may serve as such for more than two successive four-year terms. Any person appointed

---

[1] References to a "section" are to provisions of the San Francisco Charter, itself abbreviated to "Charter."

to the office of supervisor to complete in excess of two years of a four-year term shall be deemed, for purposes of this section, to have served one full term upon expiration of that term. No person having served two successive four-year terms may serve as a supervisor, either by election or appointment, until at least four years after the expiration of the second successive term in office. Any supervisor who resigns with less than two full years remaining until the expiration of the term shall be deemed, for the purposes of this section, to have served a full four-year term." It further provided that "The effective date of this section as amended is July 1, 1990. All supervisors holding office on that date shall be deemed to have served one full four-year term upon the expiration of their current terms of office."

In November 1995, the voters adopted a new Charter. Now considerably shortened and renumbered as section 2.101, the term limit provision reads:

"Each member of the Board of Supervisors shall be elected at a general election and shall serve a four-year term commencing on the eighth day of January following election and until a successor qualifies. The respective terms of office of the members of the Board of Supervisors in effect on the date this Charter is adopted shall continue.

"No person elected or appointed as a Supervisor may serve as such for more than two successive four-year terms. Any person appointed to the office of Supervisor to complete in excess of two years of a four-year term shall be deemed, for the purpose of this section, to have served one full term. No person having served two successive four-year terms may serve as a Supervisor, either by election or appointment, until at least four years after the expiration of the second successive term in office. Any Supervisor who resigns with less than two full years remaining until the expiration of the term shall be deemed, for the purposes of this section, to have served a full four-year term."

The voter information pamphlet provided by the city devoted more than 20 pages to summarizing the proposed Charter and presenting pro and con arguments. Nothing in this material suggested that the reduced language made any substantive change to the term limits provision adopted five years earlier. And the rounding up language remained untouched.

In November 1996, in an effort to increase electoral accountability, San Francisco voters approved a new system of electing members of the board of supervisors, by district rather than citywide. As part of the transition, the measure provided that half of the board of supervisors elected at the next general election would serve two-year terms, while the other half would serve four-year terms. It also showed that attention was still being paid to rounding

up: "Those members of the board of supervisors . . . who only serve an initial two-year term, shall not be deemed to have served a full term for purposes of the term limit established in Section 2.101." (Charter, § 13.110(f).)

Until 2002, vacancies on the board of supervisors were filled by the mayor under this provision of the Charter: "If a vacancy shall exist on the Board of Supervisors because of the death, resignation, permanent disability or the inability of a member to otherwise carry out the responsibilities of the office, the Mayor shall appoint a qualified successor. Should more than 29 months remain in the unexpired term, the appointee shall serve until the next general election municipal or statewide election occurring not less than 120 days after the appointment, at which time an election shall be held to fill the unexpired term." (Former § 2.102.)

■ This appointment power was deemed insufficiently democratic, which led to Proposition C, which came before the voters on November 6, 2001. It passed, and so the mayor's appointment power was curtailed. The voters repealed section 2.102 and replaced it with section 13.101.5. As relevant here, the new provision specified that if the mayor appointed a person to fill a vacancy as supervisor, that person "shall serve until a successor is selected at the next election occurring not less than 120 days after the vacancy, at which time an election shall be held to fill the unexpired term, provided that (1) if an election for the vacated office is scheduled to occur less than one year after the vacancy, the appointee shall serve until a successor is selected at that election or (2) if an election for any seat on the same board as the vacated seat is scheduled to occur less than one year but at least 120 days after the vacancy, the appointee shall serve until a successor is selected at that election to fill the unexpired term." (§ 13.101.5(c).) Again, nothing was mentioned about changing the essential features of term limits, and rounding up remained in place.

In November 2002, Gavin Newsom, the supervisor for district two, won election to a four-year term commencing January 8, 2003, and ending on January 8, 2007. In December 2003, Newsom was elected mayor.

On January 26, 2004, having been sworn in as mayor, Newsom appointed Michela Alioto-Pier as his successor as the supervisor for district two.

On November 2, 2004, pursuant to section 13.101.5, Alioto-Pier was elected to serve the remainder two years of the term to which Newsom had been elected in 2002.

On November 7, 2006, Alioto-Pier was elected to a four-year term as supervisor for district two. That term was to commence on January 8, 2007, and end on January 8, 2011.

Less than a year into her new term, Alioto-Pier was already eyeing another, and sometime during that year asked the city attorney whether she could run in 2010. In a written opinion dated February 6, 2008, he answered that she could not, squarely because of the rounding up language in section 2.101: "[Y]our appointment and subsequent election to finish the term that expired in January 2007 counts as a full term for purposes of the Charter's term limits provisions. You served nearly three years of a four-year term. The Charter provides that persons 'appointed . . . to complete in excess of two years of a four-year term' will be deemed to have served a full term. This rounding up provision refers to appointees who serve more than two years of the term to which they were initially appointed, whether they stand for election during that period. Any other interpretation of section 2.101 would render the rounding up provision meaningless."

Nothing more occurred on this issue until June 3, 2010, when Alioto-Pier submitted her declaration of intent to run in the November 2010 election for another term as district two supervisor. That same day, after being advised by the city attorney that this would be contrary to section 2.101, John Arntz, the director of the elections department, notified Alioto-Pier that her nomination papers would not be accepted for filing, and her name would not be placed on the ballot as a candidate at the November 2010 election. Alioto-Pier's request for "reconsideration" of the city attorney's position failed.

On June 17, Alioto-Pier filed a petition for declaratory relief that section 2.101 did not prohibit her from standing for election to another four-year term as supervisor, and a writ of mandate directing Arntz to "accept any filings required for her candidacy including her nomination documents . . . and to print her name as a candidate for District Two supervisor on the November 2, 2010 ballot and any other official election materials."[2] Five days later, she moved respondent San Francisco Superior Court to grant both forms of relief.

After receiving Arntz's opposition, the court requested the parties to consider "whether section 2.101 would have required rounding up as to 36 months of an expired term prior to the enaction of sections 13.101.5 given the applicability of section 2.102," the provision repealed in November 2001 at the same time section 13.101.5 was enacted. (See fn. 3, and accompanying text, *post.*)

The court conducted a hearing on July 22. After hearing extensive argument, the court indicated from the bench that it was granting Alioto-Pier's motion and ordering the relief requested.

---

[2] The city attorney and the City and County of San Francisco were also named as defendants, and are petitioners to this proceeding. In the interests of clarity and simplicity, the three defendants will hereafter be collectively designated as "City."

In its petition filed in this court on July 28, the City advised that if the order was not set aside by September 1, Alioto-Pier's name would have to appear on materials for the November 2, 2010 election. It therefore requested our decision "no later than August 16." Alioto-Pier did not dispute this chronology, but did oppose action by this court to overturn respondent court's July 22 decision.

In light of this information, the City's right to appeal from a subsequent final judgment or order would not constitute a "speedy . . . and adequate remedy," because effective relief could not be given. (Code Civ. Proc., § 1086; see *Andal v. Miller* (1994) 28 Cal.App.4th 358, 360–361 [34 Cal.Rptr.2d 88].) Moreover, the issues of a person's eligibility to run for public office and the correct administration of public elections are clearly weighty matters of public interest in which the City has a vital interest. (See, e.g., *Brown v. Superior Court* (1971) 5 Cal.3d 509, 514–515, 524 [96 Cal.Rptr. 584, 487 P.2d 1224]; *Patterson v. Board of Supervisors* (1988) 202 Cal.App.3d 22, 29–30 [248 Cal.Rptr. 253]; see also *San Francisco Forty-Niners v. Nishioka* (1999) 75 Cal.App.4th 637, 643–645 [89 Cal.Rptr.2d 388] and authorities cited.) We informed the parties that we might order issuance of a peremptory writ in the first instance. (*Brown, Winfield & Canzoneri, Inc. v. Superior Court* (2010) 47 Cal.4th 1233 [104 Cal.Rptr.3d 145, 223 P.3d 15]; *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171 [203 Cal.Rptr. 626, 681 P.2d 893].) Given the importance of the issues involved, the parties were afforded oral argument. (See *Lewis v. Superior Court* (1999) 19 Cal.4th 1232, 1252–1253 [82 Cal.Rptr.2d 85, 970 P.2d 872].)

On August 5, after the City had filed its petition, respondent court filed its formal order in the matter. The relevant portions of the order, with the addition of certain editorial modifications, provide as follows:

"For the following reasons, the Court finds that section 2.101 of the San Francisco City Charter does not compel the rounding up of Supervisor Alioto-Pier's prior service of appointment and then election to the San Francisco Board of Supervisors from January 26, 2004 to January 7, 2007, and therefore, section 2.101 does not prevent her from seeking reelection in the November 2, 2010 election.

"First, this conclusion is consistent with the plain language of the Charter, which expressly applies the rounding up provision to a person 'appointed . . . to complete [a term] in excess of two years.' Section 2.101 carefully distinguishes between 'appointment' and 'election,' indicating that the voters understood the distinction between the two words and found it meaningful.

"Second, when section 2.101 was amended by the voters in 1995, the voters also amended section 2.102 to allow a person to serve in excess of two

years by way of appointment, election, or appointment and election.[3] The voters nevertheless chose to have section 2.101 applied only to those persons 'appointed' to serve in excess of two years. There is no indication that the voters intended to apply the rounding up provision to those elected or appointed and elected to serve in excess of two years, notwithstanding the fact that such a result could have easily been accomplished by using the kind of language that the City Attorney has used in describing the rounding up provision. Therefore, from the time that these 1995 changes to the Charter became effective until 2001, an individual appointed to fill a vacancy for between 24 and 29 months would have been deemed to have served a four-year term, whereas somebody appointed to fill a vacancy in excess of 29 months would have had to stand for election, and therefore would not have been deemed to have served a four-year term. This is not an absurd result, rather it reflects the reasonable conclusion that voters are less concerned about the rounding up issue when they have made their own choice as to the person who should serve the remainder of a term.

"Third, the adoption of section 13.101.5 in 2001 did not change the preexisting intent of the voters, as evidenced in the 1995 amendments to the Charter, or the meaning of section 2.101. While section 13.101.5 may not leave any scope for the application of the rounding up provision, the voters had an opportunity to express themselves with respect to that concern and did not. There is not an inconsistency or conflict in the application of section 2.101 and section 13.101.5. The enactment of section 13.101.5 can not be construed as an 'implied repeal' of section 2.101, because the circumstances to which section 2.101 applied immediately prior to the adoption of section 13.101.5 is consistent with the outcome that the Court reaches here. To construe the impact of section 13.101.5 otherwise would be in effect to repeal the voters' intent.

"Fourth, given the First Amendment concerns at issue, if there is potential ambiguity in a term limit provision, the Court should err on the side of permitting an individual to run. While it is not clear that there is any ambiguity here, this principle also helps inform the Court's decision.

"Therefore, IT IS ORDERED that plaintiff/Petitioner's motion to grant declaratory relief and writ of mandate is GRANTED."

The order further directed that "a peremptory writ of mandate issue commanding Director Arntz, and all persons acting pursuant to his direction

---

[3] The voters in 2001 did not amend section 2.102, they repealed it. (See S.F. Voter Information Pamp., Consolidated Municipal Elec. (Nov. 6, 2001) p. 38 [text of Prop. C: "The Board of Supervisors hereby submits . . . a proposal to amend the Charter . . . by repealing Section[] 2.102 . . . ."].)

and control, to acknowledge Supervisor Alioto-Pier as a candidate for reelection as District Two Supervisor, to accept any filings required for her candidacy including her nomination documents, and to print her name as a candidate for District Two Supervisor on the November 2, 2010 ballot and any other official election materials, if Supervisor Alioto-Pier otherwise qualifies for office and is in compliance with the legal requirements to be a candidate."[4] A stay was issued on this court's own motion.

## DISCUSSION

Initially, Alioto-Pier argues that mandate "removing a candidate from the ballot is unwarranted," and that the City is asking this court "to take the unprecedented step of denying a candidate her right to seek election." This objection need not detain us long. Just as it was proper for Alioto-Pier to apply for mandate from respondent court to get her name on the ballot (*Stanton v. Panish* (1980) 28 Cal.3d 107, 110 [167 Cal.Rptr. 584, 615 P.2d 1372]; *Andrews v. Valdez* (1995) 40 Cal.App.4th 492, 493 [46 Cal.Rptr.2d 744]), that same remedy can remove her name if her ineligibility for a particular public office is clear. (E.g., *French v. Jordan* (1946) 28 Cal.2d 765, 766–767 [172 P.2d 46]; *Donham v. Gross* (1930) 210 Cal. 190, 192–193 [290 P. 884]; *Felt v. Waughop* (1924) 193 Cal. 498, 501–502 [225 P. 862].) As our Supreme Court put it, "mandamus will issue to compel an officer to conduct an election according to the law." (*Miller v. Greiner* (1964) 60 Cal.2d 827, 830 [36 Cal.Rptr. 737, 389 P.2d 129].) It is also appropriate in preelection circumstances involving " ' "issues . . . of great public importance [that] should be resolved promptly." ' " (*Legislature v. Eu, supra*, 54 Cal.3d 492, 500, quoting *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 340 [276 Cal.Rptr. 326, 801 P.2d 1077].) So, when Alioto-Pier asserts that "No California Court of Appeal has ever removed a candidate from the ballot based on a term limit provision by way of extraordinary writ" she may be literally correct, but the novel application of an established principle is no jurisdictional bar to action.

The question is whether Alioto-Pier is eligible to stand for another four-year term, a question to be resolved exclusively on the basis of provisions of the Charter, all of which were added by initiative. Because the provisions are all of equal dignity, we construe them according to well-established principles: "The court's primary task in statutory construction is to ascertain the intent of the legislative body to effectuate the purpose of the law. [Citation.] In construing a provision adopted by the voters our task is to ascertain the intent of the voters. [Citation.] We look first to the

---

[4] The clerk of the San Francisco Superior Court kindly provided a copy of this order, and the record was augmented to include it.

words themselves, which should be given the meaning they bear in ordinary use. [Citations.] If the language is clear and unambiguous there is no need for construction and courts should not indulge in it. [Citation.] However, this plain meaning rule does not prohibit a court from determining whether the literal meaning of a charter provision comports with its purpose, or whether construction of one charter provision is consistent with the charter's other provisions. [Citation.] Literal construction should not prevail if it is contrary to the voters' intent apparent in the provision. [Citation.] 'An interpretation that renders related provisions nugatory must be avoided . . . , [and] each sentence must be read . . . in the light of the [charter's overall] scheme . . . .' [Citation.] Provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.]"[5] (*International Federation of Professional & Technical Engineers v. City and County of San Francisco* (1999) 76 Cal.App.4th 213, 224–225 [Cal.Rptr.2d 186].) And we reiterate, in the words of our Supreme Court, it is the intent of the voters of San Francisco that is " '*the paramount consideration.*' " (*Legislature v. Eu, supra*, 54 Cal.3d 492, 505.)[6]

---

[5] As should be apparent from this discussion, the same principles of construction that apply to statutes also apply to the interpretation of charter provisions. (E.g., *United Assn. of Journeymen v. City and County of San Francisco* (1995) 32 Cal.App.4th 751, 760 [38 Cal.Rptr.2d 280]; *Squire v. City and County of San Francisco* (1970) 12 Cal.App.3d 974, 980 [91 Cal.Rptr. 347].)

[6] The parties cite a number of authorities addressing the state term limits, but they are of limited assistance. *Legislature v. Eu, supra*, 54 Cal.3d 492 sustained the validity of the state limits against a variety of constitutional arguments. An Attorney General opinion authored by now Justice Peter Siggins concerning partial terms under the state legislative term limits (86 Ops.Cal.Atty.Gen. 43 (2003)) is distinguishable because the Governor does not have the power to make appointments to the Legislature, so there is no occasion to consider how time spent as an appointee would figure in the state limits. The Court of Appeal in *Schweisinger v. Jones* (1998) 68 Cal.App.4th 1320 [81 Cal.Rptr.2d 183] held that an elected member of the Assembly who had served part of a term before being recalled had served a full term for purposes of the state limits.

The local term limit decisions are only marginally more relevant. In *Conde v. City of San Diego* (2005) 134 Cal.App.4th 346 [36 Cal.Rptr.3d 54], the Court of Appeal held that a municipal law limiting city council members to two consecutive terms did not prohibit a subsequent third nonconsecutive term. No question involving nonconsecutive terms is presented here. In *Pope v. Superior Court* (2006) 136 Cal.App.4th 871 [39 Cal.Rptr.3d 183], a municipal law that " 'No person shall be elected as a member of the city council for more than two four-year terms . . .' " was held not to include the five months the council member served after being appointed and the 17 months served after being elected at a special election. Section 2.101 is not similarly restricted. And there was dissent that "the ordinance . . . can be interpreted reasonably to preclude a person from being elected for anything *more* than the two four-year terms—i.e., the person cannot be elected for a 17-month term and two four-year terms because that would mean being elected for 'more than two four-year terms.' " (*Pope*, at pp. 877–878 (dis. opn. of Mosk, J.).) The one decision that is useful is *Woo v. Superior Court* (2000) 83 Cal.App.4th 967 [100 Cal.Rptr.2d 156], which is discussed *post*.

The disagreement between the parties is simple and stark. Each holds the polar opposite construction of the so-called "rounding up" provision in section 2.101. The City maintains that the term limit prohibition of section 2.101 includes a partial term to which a supervisor is appointed, even if the appointee is subsequently elected in accordance with section 13.101.5. Alioto-Pier responds that the rounding up provision applies only to a supervisor who is *appointed* "to complete in excess of two years of a four-year term." She was *appointed* to a term of less than one year, and then filled the remaining two years of Supervisor Newsom's four-year term only because she was *elected* as required by section 13.101.5. Thus, the rounding up provision in section 2.101 does not operate to make that three-year period of service count as one of the permitted two terms, and she is accordingly eligible to run for another four-year term. We agree with the City.

It is undisputed that when the voters adopted term limits in 1990 they clearly intended that a supervisor who was appointed "to complete in excess of two years of a four-year term shall be deemed . . . to have served one full term." (§ 2.101.) This was entirely logical because at the time supervisors were either elected to four-year terms or were appointed by the mayor to fill a term—all of a term—to which someone else had already been elected. There was then no possibility an appointed supervisor could be elected for part of the unserved term to which he or she was appointed. Thus, what is now section 2.101 addressed all possible variations of supervisorial service. Persons who were elected and served four years were deemed to have served one of the two terms they were allowed. If the person elected was unable to serve four years, the mayor appointed a replacement. If the appointee served two years or less, that period of service did not count as one of the two terms the person could serve. But if the appointee served "in excess of two years," that was counted as one of the two terms that person could serve. There was no gap in the coverage of the term limits provision.

The enactment of section 13.101.5 in 2001 removed the possibility that an appointed supervisor could serve more than 29 months without having to face the voters. The digest in the voter information pamphlet prepared by the Ballot Simplification Committee explained how the proposed section 13.101.5 would work: "If less than 29 months remain in the term of the vacated office, the person appointed to fill the vacancy serves out the remainder of the term. If more than 29 months remain in the term of office, the person appointed to fill the vacancy serves only until the next scheduled election occurring at least 120 days after the appointment. At that election, the voters elect a candidate to complete the term." (S.F. Voter Information Pamp., Consolidated Municipal Elec. (Nov. 6, 2001) p. 33.)

There is no dispute that an appointee who serves more than 24 months but less than 29 months is deemed to have served a full term within the meaning

of section 2.101. This provision made it legally impossible for an appointee to serve as a supervisor for more than 29 months solely by virtue of a mayoral appointment. But according to Alioto-Pier's analysis, an appointee in her position—one who serves a period by virtue of the appointment, who then is elected to serve the remaining two years of the term—does not have the entire period of service count as one of the two terms a supervisor is permitted.

Nothing in the 2001 voter information pamphlet hints at such a result. The measure was touted as enhancing official accountability to the voters,[7] yet Alioto-Pier's construction means that she will have served almost all of a four-term that is effectively exempted from section 2.101. If accepted, it would create an exception to the term limits provision that would swallow the rule, as it would give her the opportunity to serve almost three full terms instead of the two terms contemplated by section 2.101. And it would ignore rounding up. This would be, in statutory interpretation language, an absurd result, which courts must try to avoid. (*Larsen v. San Francisco* (1920) 182 Cal. 1, 6, 17 [186 P. 757]; *Verreos v. City and County of San Francisco* (1976) 63 Cal.App.3d 86, 96 [133 Cal.Rptr. 649].)

*Woo v. Superior Court, supra,* 83 Cal.App.4th 967 is instructive on this point. Woo served two four-year terms as a member of the Los Angeles City Council from July 1985 to June 1993. Los Angeles adopted term limits in

---

[7] The "Proponent's Argument in Favor of Proposition C" told the voters: "San Francisco, which prides itself in letting the voters decide issues of importance to the City, is behind the times and out of step when it comes to filling vacancies to local office. [¶] In California, if a vacancy occurs for the U.S. Senate, the Governor's appointee must face the voters within two years. Likewise, if a vacancy occurs for the U.S. Congress or for the California legislature, voters elect the successor within twelve months. [¶] In San Francisco, however, appointees to City-wide office and for Supervisor may serve for up to 29 months, and to the Community College and School Boards for up to 48 months before they must face the voters. [¶] With the exception of a vacancy for Mayor, which is filled by the Board of Supervisors, all other vacancies are filled by the Mayor. [¶] From 1996 to 1999, the Mayor appointed six members to the Board of Supervisors—a majority of the old Board. [¶] This tended to limit open debate at the Board on the issues of great importance to San Francisco, and undermine the independence of the Board as a co-equal branch of government. [¶] The voters last Fall, stated, loud and clear, that they wanted to see balance restored to City government, and to make the Board more accountable to the voters. [¶] Proposition C would do just that. [¶] In most cases, this Charter Amendment would limit the time to one year that appointees would serve without standing for election. The appointees would face the voters at elections already scheduled, resulting in no additional cost to administer elections. [¶] Proposition C would restore balance to City Government, put San Francisco in step with the rest of the State, and shift power to fill all elective offices back to the voters where it rightfully belongs. [¶] Vote Yes on Proposition C." (S.F. Voter Information Pamp., Consolidated Municipal Elec. (Nov. 6, 2001) p. 34.) The "Paid Arguments in Favor of Proposition C," including ones from the city's Democratic and Republican parties, made the same points. (S.F. Voter Information Pamp., at p. 36.) The measure was apparently so uncontroversial that no opposition argument or paid argument was submitted.

1993 with a measure specifying that it applied only to terms commencing after July 1, 1993, i.e., after Woo left office. In 1999, voters adopted a new charter that was identical to the 1993 provision, except that it omitted the language limiting its application to terms commenced after July 1993. In 2000, Woo wished to run again for the city council but the city clerk refused to accept his candidacy papers on the ground that the new charter provision barred him because he had already served two full terms. (*Id.* at pp. 971–972.)

█ The Court of Appeal overturned the clerk's decision. It paid particular attention to the voters being told in the voter information pamphlet that the new charter " 'Retains current term limits for elected City officials.' " Citing the rule that voter intent is paramount, the court then stated, "we will not presume that the lawmakers (here, the voters) intended the literal construction of a law if that construction would result in absurd consequences. [Citations.] In those circumstances, we must consider extrinsic evidence of the voters' intent despite the unambiguous language of the enactment. [Citations.] ' "[T]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." ' [Citation.]" (*Woo v. Superior Court, supra*, 83 Cal.App.4th 967, 971, 975, italics omitted.)

The court concluded that the new charter's literal language could be construed to carry forward the limiting language in the 1993 term limit provision. Its analysis leading to that conclusion took account of the voter information pamphlet for the new charter as well as "[t]he historical context in which the provision was adopted." (*Woo v. Superior Court, supra*, 83 Cal.App.4th 967, 976–977, citing *Rossi v. Brown* (1995) 9 Cal.4th 688, 700, fn. 7 [38 Cal.Rptr.2d 363, 889 P.2d 557].[8]) "The description and summary of the [new charter] provided in the official ballot pamphlet indicated no change in the existing term limits law or in the rule that terms served before July 1993 did not count toward the two-term limit. The pamphlet did not state that the law would be changed substantially so as to count those terms served before July 1993 that were excluded under the existing provision, but stated that the existing term limits would be '*retain[ed]*' and thus expressly represented that there was no change . . . and the failure to mention any change in the law reasonably led the voters to believe that there was no change." (*Woo v. Superior Court, supra*, at p. 977, fn. omitted.)

The court then detailed the absurd consequences that would follow from a literal application of the new charter language: "the provision would prevent seven incumbent council members who served two terms before July 1, 2000, from completing their current terms in office. . . . Thus, if the literal meaning

---

[8] In *Rossi v. Brown, supra*, 9 Cal.4th 688, our Supreme Court held that San Francisco voters were authorized to use the initiative process to prospectively repeal a taxing measure.

were applied, seven of the 15 council districts immediately would become unrepresented, requiring a special election or appointment [citation]. Meanwhile, the city council would lack a quorum and would be completely disabled. The unseated incumbents very likely would challenge the constitutionality of the measure, leading to contentious and difficult litigation." (*Woo v. Superior Court, supra,* 83 Cal.App.4th 967, 975–976, fns. omitted.) "Absent some indication that the voters were aware of and intended that result, we cannot adopt a construction that would require [such] result[s]." (*Id.* at p. 977.)

Although the consequences of Alioto-Pier's interpretation would not be as dire as those in *Woo,* they would be substantial. As shown by the argument in favor of Proposition C, the 2001 measure that added the election requirements of section 13.101.5, mayoral appointments to the board of supervisors are not uncommon. (See fn. 7, *ante.*) If anything, the City believes they are becoming even more common.[9] Yet there is nothing attending the passage of that measure suggesting that it would create a significant exception to the application of section 2.101 because an appointed supervisor would never serve a term in excess of two years that would count as one of the two terms allowed by section 2.101. Even making allowance for an advocate's tendency to hyperbole, there is considerable force to the City's characterization of Alioto-Pier's construction as giving "a free pass from term limits," at least as to the first term of an appointed supervisor who is subsequently elected to a term of service. Indeed, as the facts here show, up to three years of supervisorial service would be exempt from the two-term limitation.

As previously mentioned, term limits was adopted by the voters in 1990 as Proposition N. The Voter Information Pamphlet for that measure has an analysis prepared by the Ballot Simplification Committee, and official arguments pro and con, as well as paid arguments pro and con. The one point of agreement was that if Proposition N were adopted "no person could serve more than two consecutive four-year terms . . . ." (S.F. Voter Information Pamp., Consolidated Primary Elec. (June 5, 1990) p. 113.) The materials concerning the measure appear under the heading "Two-Term Limit for Supervisors." (*Ibid.*) The phrase "two-term limit" is used numerous times, by proponents and opponents. And any supervisor appointed to "complete in excess of two years of a four year term shall be deemed . . . to have served one full term . . . ." (*Id.* at p. 120, boldface omitted.)

---

[9] The City states in its petition that "In the past 16 years alone, nine Board members have taken office through Mayoral appointment before winning an election. Three current Supervisors and the . . . Mayor all initially joined the Board as appointees. In addition to Alioto-Pier, one other current Supervisor to whom the 'rounding up' rule should have applied will, under the Superior Court's ruling, be eligible to serve nearly eleven years. Based on the frequency of past appointments, it is likely that there will soon be other appointed Supervisors to whom the 'rounding up' rule should apply."

Nothing in the materials for the ensuing adoption of a new charter in 1995 or the adoption of section 13.101.5 in 2001 indicates that the voters intended any relaxation of the two-term limit, or the elimination of rounding up. On the other hand, when the voters approved the switch to the system of electing supervisors by district in 1996, they knew they were approving a limited exception to the two-term ban, demonstrating that if the drafters of legislation intended to create an exemption to the two-term limit, they knew how to do so—and do so openly. And if they truly intended to create the additional exemption for which Alioto-Pier now argues, they logically would have deleted the rounding up language in section 2.101, because it would no longer be possible for a person appointed to the board of supervisors to serve in excess of two years solely by appointment.

██ Alioto-Pier's construction of section 2.101 implicitly presumes that the adoption of section 13.101.5 is a binding modification. If we accepted that construction, we would be accepting that section 13.101.5 effected an implied repeal of the flat two-term prohibition in section 2.101. That is a consequence we can adopt only if absolutely required. (*ITT World Communications, Inc. v. City and County of San Francisco* (1985) 37 Cal.3d 859, 866 [210 Cal.Rptr. 226, 693 P.2d 811]; *Wong Him v. City & County of S. F.* (1948) 87 Cal.App.2d 80, 83 [196 P.2d 135].) Her construction would also condemn the rounding up language of section 2.101 to surplusage, another conclusion we strive to avoid. (*City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 54 [184 Cal.Rptr. 713, 648 P.2d 935]; *Breslin v. City and County of San Francisco* (2007) 146 Cal.App.4th 1064, 1081 [55 Cal.Rptr.3d 14]; *International Federation of Professional & Technical Engineers v. City and County of San Francisco, supra*, 76 Cal.App.4th 213, 225.)

Respondent court candidly acknowledged that its interpretation "may not leave any scope for application of the rounding up provision in [section] 2.101." And the city attorney insists that the court's ruling "renders the rounding up provision meaningless." Alioto-Pier says this is "simply not true," because there is "at least one scenario in which a Supervisor could still be appointed for more than two years of an unexpired term." That scenario is, to put it mildly, farfetched.

The scenario envisioned by Alioto-Pier is that "one person is appointed to fill a vacancy *on two occasions during the same unexpired term.*" Her brief sets forth a chart detailing a concrete example, and then describes it: "Essentially, if more than one vacancy occurred during a single four-year term and the Mayor decided to appoint the same person to fill both vacancies—for example, the elected-Supervisor's chief of staff or a neutral 'placeholder'—it is possible, and in fact very likely, that the appointee would serve in excess of two years—and that the appointee would serve this amount of time without ever standing for election."

In the hypothetical, the mayor's appointee loses the election; the winner takes office, and shortly thereafter dies; and the mayor again appoints the person who has just lost. If this is evidence of real-life politics, it comes in a novel guise.

Alioto-Pier admitted below that "it is impossible" for an appointed supervisor to serve more than two years solely by reason of a mayoral appointment. From that she argued, based on the literal language of section 2.101, that her first three years on the board of supervisors means she is not a "person appointed to the office of Supervisor to complete in excess of two years of a four-year term" within the plain language of that provision of the Charter. That phrase cannot be read in isolation, but rather in light of the overall scheme, the history of term limits, and the voters' intent. (*Legislature v. Eu, supra*, 54 Cal.3d 492, 505.) Further, Alioto-Pier's reliance on *Pope v. Superior Court, supra*, 136 Cal.App.4th 871, is misplaced. *Pope* dealt with a municipal law pegged exclusively to elected terms, with no mention of time served pursuant to an appointment, and no rounding up provision. Here, we are considering a term limit provision that expressly addresses both appointments and elections—and which does have a rounding up provision.

Alioto-Pier's final argument asserts that the "voters have specifically rejected the expansive application" urged by the city attorney, an argument premised on the voters' rejection in 2008 of Proposition F which, Alioto-Pier quotes, "would have amended section 2.101 to read: 'Any person appointed, *elected, or any combination thereof* to the office of Supervisor to complete in excess of two years of a four-year term shall be deemed, for the purpose of this section to have served one full term.' " This argument fails for several reasons.

To begin with, while Proposition F did contain the quoted language on which Alioto-Pier relies, any fair reading of the proposition reveals that it was not in any sense related to term limits, but only the scheduling of elections. The title of the proposition, set forth in boldface letters, described it this way: "Holding All Scheduled City Elections Only in Even-Numbered Years." The ballot question read: "Shall the City shift all City elections except special elections to even-numbered years after the November 2011 election?" (S.F. Voter Information Pamp., Consolidated Presidential General Elec. (Nov. 4, 2008) p. 113, boldface omitted.)

That *the* purpose of Proposition F was election scheduling is reflected in *all* arguments for and against the measure in the voter pamphlet. None of the arguments, not even the two against arguments signed by Alioto-Pier herself—who as of the time Proposition F went on the ballot had been advised

by the city attorney that she could not run for another term—mentioned that Proposition F would have any effect on term limits. As the city attorney says, the reference to section 2.101 in Proposition F "was tangential to the overall measure, and would merely have maintained the existing 'rounding up' rule." As to section 2.101, Proposition F might have been, at most, "an effort only to clarify a statute's true meaning," and thus a situation where "the true meaning of the statute remains the same." (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 [62 Cal.Rptr.2d 243, 933 P.2d 507].)

The true meaning was set forth in the voter digest for Proposition F—prepared by the neutral Ballot Simplification Committee—which told the voters that "The Charter establishes limits of two successive 4-year terms for the Mayor and members of the Board of Supervisors. Any partial term of two or more years counts as a full term." (S.F. Voter Information Pamp., Consolidated Presidential General Elec. (Nov. 4, 2008) p. 113.)

█ Finally, even if the purpose of Proposition F had been to ask for reconsideration of section 2.101, it would not avail Alioto-Pier, as the voters' rejection of a later measure does not demonstrate the voters' intent at an earlier time. "Divining the People's 'intent' by looking at a measure they *rejected* is, indeed, a dubious undertaking, if for no other reason than different voters may have been animated by different motivations." (*Schweisinger v. Jones, supra*, 68 Cal.App.4th 1320, 1328.) Our Supreme Court has deemed it "wholly unpersuasive evidence of the voters' intent in enacting [earlier] propositions." (*Yoshisato v. Superior Court* (1992) 2 Cal.4th 978, 991, fn. 7 [9 Cal.Rptr.2d 102, 831 P.2d 327].)

Twenty years ago the voters of San Francisco imposed term limits on their supervisors, so that "no person elected or appointed" could serve "more than two successive four-year terms," and a person appointed to complete more than two years would "be deemed . . . to have served one full term," with his or her service rounded up. (S.F. Charter, former § 9.100.) Nothing in the ensuing years changed the two-term limit. Nothing changed the rounding up provision. And nothing changed the voter-imposed mandate that no appointed supervisor could serve more than 10 consecutive years. Alioto-Pier has already served two consecutive terms. She may not seek a third.

## DISPOSITION

Let a peremptory writ of mandate issue commanding respondent court to set aside its order of August 5, 2010, and to enter an order denying the "Motion To Grant Declaratory Relief And Writ Of Mandate" filed by real party in interest Michela Alioto-Pier. In light of the need for speed, we order this decision to be final forthwith. (Cal. Rules of Court, rule 8.490(b)(3).)

Petitioners shall recover their costs. The stay previously imposed shall remain in effect until the remittitur issues.

Kline, P. J., and Lambden, J., concurred.

The petition of real party in interest for review by the Supereme Court was denied September 1, 2010, S185808. Chin, J., did not participate therein.