[No. B216006. Second Dist., Div. Six. Jan. 25, 2011.]

CITIZENS PLANNING ASSOCIATION et al., Plaintiffs and Respondents,
v.
CITY OF SANTA BARBARA et al., Defendants;
PEAK-LAS POSITAS PARTNERS et al., Real Parties in Interest and
Appellants.

COUNSEL

Price, Postel & Parma, Timothy E. Metzinger; Brownstein Hyatt Farber Schreck and Steven A. Amerikaner for Real Parties in Interest and Appellants.

Wittwer & Parkin, William P. Parkin, Jonathan Wittwer, Ryan D. Moroney; Law Office of Marc Chytilo and Marc Chytilo for Plaintiffs and Respondents.

OPINION

COFFEE, J.—The City of Santa Barbara (City) approved the development of 25 single-family homes. The project was to be constructed by real parties in interest and appellants, Peak-Las Positas Partners and its managing partner, Mark Lee (Las Positas). The City and Las Positas wished to provide access to the development via construction of a concrete bridge and roadway, which would create a significant (Class I) environmental impact to Arroyo Burro Creek.

Citizens Planning Association and Santa Barbara Urban Creeks Council (CPA) filed a petition for a writ of mandamus, requesting the trial court to enjoin the development. CPA alleged that voter approval was required before construction could begin. Pursuant to the city charter (City Charter), the City may not encumber parkland without a vote, and the bridge and roadway would cross over City-owned parkland. The trial court agreed, and issued a peremptory writ of mandate enjoining development until the matter could be placed on the ballot. We affirm.

FACTS

On December 19, 2006, the City approved a development project known as Veronica Meadows. It involved construction of 25 two-story homes ranging from 1,800 to 4,500 square feet. The total project size was approximately

50.5 acres, with the homes occupying approximately 14.8 acres. The remaining 35.7 acres, largely constrained by slopes and other hazards, was to be dedicated as open space. The proposed development site is located within the unincorporated area of the Las Positas Valley, between Arroyo Burro Creek to the east, and Campanil Hill to the west. The southern portion of the property is located in the coastal zone. The site is currently undeveloped with access via Alan Road. The property was to be annexed from the unincorporated area to the City. A bridge would originate at Las Positas Road and span Arroyo Burro Creek to provide access to the project.

The City's approval provided for only three lots to have access via Alan Road. In 2008, a revised environmental impact report (REIR) was prepared pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). It specified that the remaining 22 lots were to have access over the bridge and roadway to be built "over a City-owned open space parcel" and span Arroyo Burro Creek. The bridge would measure 140 feet long and 31.67 feet wide, with two 10-foot travel lanes and two 4-foot sidewalks. Street lights would be placed at each end of the bridge, which would intersect Las Positas Road. The bridge and road would occupy a 5.89-acre parcel. A bicycle path would run through the site, using the interior roads.

It is undisputed that the bridge will cause significant and unavoidable (Class I) environmental impacts to Arroyo Burro Creek. The REIR provided that the project includes "habitat restoration along both banks of Arroyo Burro Creek" and notes that "[m]uch of the restoration would occur on a City-owned open space parcel . . . ." The REIR specified that one of the project objectives was to "[i]mplement a creek corridor restoration plan to improve habitat and water quality along Arroyo Burro Creek consistent with City creek policies and programs." Las Positas argues that the bridge construction will provide public recreational uses by creating access to Arroyo Beach and nearby parks (Elings Park and the Douglas Family Preserve), as well as access to pedestrian and bicycle paths within the project.

CPA filed a petition for a writ of mandamus on both CEQA and non-CEQA grounds, requesting the trial court to enjoin further development. CPA alleged that, pursuant to section 520 of the City Charter (hereafter section 520), the City may not encumber City-owned parkland without a vote of the electorate. At a hearing on December 9, 2008, the trial court denied the writ petition as to the substantive CEQA issues. However, it issued a peremptory writ of mandate enjoining the City from constructing a bridge or road over City-owned parkland without first obtaining voter approval, pursuant to the City Charter.

The trial court issued a 33-page statement of decision detailing its analysis and the parties' litigation history. It indicated that "[w]ithout the necessity to provide ingress to and egress from the private residential development, there would be no bridge and road. With that necessary clarification, it becomes readily apparent that, regardless of whether the rights granted to construct the bridge and road are [by] an easement or an encroachment permit, such rights encumber the City-owned property, and are not compatible with or accessory to the use of the property as parkland." CPA was awarded attorney fees of $175,888. Las Positas filed a notice of appeal, challenging the trial court's interpretation of the City Charter.

## DISCUSSION

### *Interpretation of Section 520 of the City Charter*

#### *(1) Intent of the Voters*

■ When considering matters of statutory interpretation, we exercise our independent judgment and review the matter de novo. (*Carson Citizens for Reform v. Kawagoe* (2009) 178 Cal.App.4th 357, 366 [100 Cal.Rptr.3d 358]; *Simpson v. Unemployment Ins. Comp. Appeals Bd.* (1986) 187 Cal.App.3d 342, 350 [231 Cal.Rptr. 690].) The same principles that apply to statutory construction also apply to the interpretation of city charter provisions. (*Arntz v. Superior Court* (2010) 187 Cal.App.4th 1082, 1092, fn. 5 [114 Cal.Rptr.3d 561].) To construe a provision that has been adopted by the voters, we must ascertain their intent. (*Id.* at p. 1091; *International Federation of Professional & Technical Engineers v. City and County of San Francisco* (1999) 76 Cal.App.4th 213, 224–225 [90 Cal.Rptr.2d 186].) " 'If the language is clear and unambiguous there is no need for construction and courts should not indulge in it. [Citation.] However, this plain meaning rule does not prohibit a court from determining whether the literal meaning of a charter provision comports with its purpose . . . . [Citation.]' " (*Arntz*, at p. 1092.) The intent of the voters is the paramount consideration. (*Ibid.*; see *Legislature v. Eu* (1991) 54 Cal.3d 492, 505 [286 Cal.Rptr. 283, 816 P.2d 1309].)

The Santa Barbara City Charter was adopted by the city council (City Council) on May 2, 1967. Section 520 was approved by election on November 2, 1982. It provides in part, "No land acquired by the City for or dedicated to public park or recreation purposes and no beach property or public utility now or hereafter owned or operated by the City shall be sold, leased or otherwise transferred, encumbered or disposed of unless authorized by the affirmative votes of at least a majority of the total membership of the

City Council and by the affirmative votes of at least a majority of the electors voting on such proposition at a general or special election at which such proposition is submitted. . . ." The final sentence of this paragraph reads, "Concessions, permits or leases compatible with and accessory to the purposes to which the property is devoted by the City and which are permitted by contract from and regulated by the City shall not be subject to this paragraph." (*Ibid.*)

### (2) Concession, Permit or Lease

Applying section 520 to our facts, voter approval is required unless (1) the bridge and roadway construction require only a "[c]oncession[], permit[] or lease[]," and (2) the bridge and roadway "is compatible with and accessory to" park use. Regarding the first requirement, Las Positas argues that only an "encroachment permit" would be needed to construct the bridge. CPA, on the other hand, maintains that the construction would require grant of an easement, necessitating a vote of the electorate.[1]

On June 17, 2008, the City Council adopted resolution No. 08-056 in which it concluded that a vote would not be required to approve the bridge and roadway construction. The City Council prefaced the resolution with the statement that it "makes the following findings pursuant to Section 520 . . . in connection with the issuance of any future construction encroachment permit necessary for the Project . . . ." The City indicated that, following construction, the road and bridge would be dedicated for public use. It recounted that, when the parcel was acquired by grant deed, the City recorded a certificate of acceptance indicating it was acquired " 'for public park purposes.' "

The resolution further stated that the "road and bridge is compatible with the park use of the City Parcel because both will facilitate public access . . . from [the existing] residential neighborhoods to the west . . . and Arroyo Burro Beach." The City reasoned that the bridge and roadway would provide safer beach access for those neighborhoods which currently access the beach along Las Positas Road, a high-speed thoroughfare without sidewalks. The

---

[1] The 2005 environmental impact report indicated that Las Positas would be required to obtain an easement. In 2008, during the comment period for the REIR, counsel for CPA inquired whether an election would be held since an easement was required. The City responded that granting an easement would be unnecessary. Instead, it would issue an encroachment permit for construction. Thereafter, the bridge and roadway would be dedicated to the City.

The City also stated that section 520 was inapplicable because the property "will continue to be owned and occupied by the City, even after the . . . bridge and access road are completed." The City added that a City-owned improvement providing public access to park property "might be considered compatible with and accessory to park use."

City Council also stated that the road and bridge "is accessory to the purposes for which the City Parcel is devoted by the City." Its rationale was that the construction would occupy only 5.89 acres, less than one percent of the parcel, leaving the remainder available for use for park purposes.

We disagree with the City, as did the trial court. Access and safety are not the purposes contemplated for the parcel which is to be burdened by the proposed bridge and roadway. The City accepted the property by means of a "Certificate of Acceptance" in which it stated the property was accepted " 'for public park purposes.' " The REIR specified that the parkland would be set aside for "habitat restoration." It was not intended to be used to provide vehicular access to a private development.

Moreover, the resolution consisted only of conclusory statements labeled as "findings" that the bridge and roadway "is compatible with the park use" and "accessory to the [park] purposes" because they provide better and safer access. The City Council conducted no evidentiary hearing, called no witnesses and recorded no findings of fact. Instead, it produced a resolution containing solely the opinions of City staff.

There is no merit to the contention that the road and bridge "is accessory" to park purposes because they would occupy only a small part of the entire parcel. Section 520 provides no exception to the voting requirement based upon the size of the transfer. It is the fact of the transfer that is subject to voter approval. The resolution is merely the City's Council's interpretation of a City Charter provision—a task which is within the sole province of the courts.

### (3) Accessory Use

Las Positas presents a further argument that vehicular access is an "accessory use" of parkland, authorized by the Santa Barbara Municipal Code. It asserts that this use is permitted for "undeveloped land," "open space," and "passive park[s]." Thus, it reasons, construction of a bridge and roadway would likewise be permissible. A closer reading of the code supports the opposite conclusion.

■ "Accessory use" is defined as "[a] use customarily incidental and accessory to the principal use of a lot or . . . structure located upon the same lot as the accessory use." (Mun. Code, § 28.04.015.) The permitted uses for park and recreational facilities are specified by category. (§ 28.37.030.) "Undeveloped parkland" has no specified use. Rather, the code provides that "[t]he future use of . . . undeveloped parklands has not been determined.

These are properties that the City owns that may or may not be appropriate for parks and/or recreation use." (*Id.*, subd. A.1.) "Open space" is land "intended to be protected and managed as a natural environment with passive recreation usage and minimal development." (*Id.*, subd. A.2.) A "passive park" is a "developed park[] of natural, cultural or ornamental quality suited to passive outdoor recreation such as bird watching, walking and picnicking." (*Id.*, subd. A.3.) Under none of the foregoing categories can construction of a bridge or roadway be considered "accessory to" the use of a city-owned parcel set aside for park purposes.

Las Positas further contends that, in construing provisions in other city charters, courts have held that uses consistent or compatible with park purposes include "libraries, hotels, restaurants, museums, art galleries, zoological and botanical gardens, memorials, and conservatories . . . ." It cites several authorities in support of its position. The first two, *Spires v. City of Los Angeles* (1906) 150 Cal. 64 [87 P. 1026] and *Slavich v. Hamilton* (1927) 201 Cal. 299 [257 P. 60], are factually inapposite. *Spires* allowed construction of a public library, while *Hamilton* permitted construction of a veterans' hall, to serve as a war memorial. Both of the foregoing authorities concern the construction of public facilities on city parkland. Here, we are concerned with facilities intended to serve a *private* development on city parkland.

Las Positas also cites *Olmstead v. City of San Diego* (1932) 124 Cal.App. 14 [12 P.2d 22]. In *Olmstead*, the city wished to build a road through Torrey Pines Park. The court enjoined the city's decision to approve the road because it would deface the natural terrain and destroy 14 indigenous pine trees in an undisturbed park area. (*Id.* at pp. 19–20.) It also held that the city charter vested management in the park board, rather than the city council. (*Id.* at p. 21.) In the case at bar, the City Charter has vested authority to convey a property interest in parkland to both the City Council *and* the voters. *Olmstead* does not support Las Positas's position.

 Section 520 was approved by election. The voters reserved to themselves the right to authorize the encumbrance of City parkland. The clear purpose of this provision is to prevent parkland from being destroyed or given to private parties without the voters' consent. Here, the result urged by Las Positas would circumvent the wishes of the electorate by giving City-owned land to a private developer without a vote of the people. We conclude that the bridge and/or roadway cannot be constructed without placing the issue on the ballot and obtaining the approval of a majority of the electorate.

*Res Judicata*

Las Positas argues that res judicata bars CPA from litigating the applicability of section 520. It asserts that the issue could have been raised in a prior writ proceeding that challenged a 2005 environmental impact report (EIR).[2] Las Positas contends that the road and bridge were part of the project approved by the City under that EIR, thus matters relating to its approval should have been raised in the prior lawsuit. However, as noted by the trial court, the appeal of the first writ petition was pending (and therefore not final) when the second case was tried. Moreover, the City did not consider the applicability of section 520 until after the trial court issued the writ in the prior proceedings.

■ Res judicata bars claims that could have been raised in the first proceeding, but were not. (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896 [123 Cal.Rptr.2d 432, 51 P.3d 297].) It "prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them." (*Ibid.*) The relief requested in the first action was for a CEQA violation, while the second action concerned voter approval for the use of City parkland, pursuant to section 520. Each action sought to vindicate separate and distinct primary rights. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1202, 1205 [24 Cal.Rptr.3d 543].) CPA could not have raised the issue of voter approval in the first petition, because the City did not address the application of the City Charter provision until it approved the modified project in 2008.

*Attorney Fees*

The trial court awarded CPA attorney fees of $175,888. It issued a statement of decision, stating that CPA had protected the citizens of Santa Barbara's right to have the bridge and roadway submitted to a vote. It also concluded that CPA forced Las Positas to comply with CEQA, vindicating an important public right. On appeal, Las Positas argues that a reversal of the judgment mandates the reversal of attorneys fees. It makes no argument concerning the propriety of the award which we therefore affirm.

---

[2] The City had previously approved the project. It relied on an EIR prepared in 2005 that did not comply with CEQA. CPA filed a petition for writ of mandamus, and the trial court directed that the matter be returned to the City Council for CEQA compliance. Las Positas appealed. While the appeal was pending, the City cured the defects with its compliance, made the necessary findings, and approved the project with access via the bridge and roadway. (*Citizens Planning Assn. v. Peak-Las Positas Partners* (Super. Ct. Santa Barbara County, 2008, No. 1243174).) We dismissed the appeal as moot. (*Citizens Planning Assn. v. City of Santa Barbara* (B205931, Apr. 30, 2009).)

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents.

Gilbert, P. J., and Yegan, J. concurred.